UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

UNITED STATES OF AMERICA

v.                                          Criminal No. 2:10cr56

MOHAMMED MODIN HASAN,

GABUL ABDULLAHI ALI,

ABDI WALI DIRE,

ABDI MOHAMMED GUREWARDHER,

ABDI MOHAMMED UMAR,

        Defendants.


## OPINION AND ORDER

This matter is before the Court on the following motions filed
by defendants Mohammed Modin Hasan ("Hasan"), Gabul Abdullahi Ali
("Ali"), Abdi Wali Dire ("Dire"), Abdi Mohammed Gurewardher
("Gurewardher"), and Abdi Mohammed Umar ("Umar") (collectively, the
"Defendants"):

(1) Defendants' separately filed motions to suppress
statements. Docket Nos. 73 (Ali), 79 (Hasan), 85
(Gurewardher), 87 (Dire), and 104 (Umar).

(2) Hasan's motions to dismiss the Indictment for lack of
jurisdiction pursuant to the Federal Juvenile Delinquency
Act. Docket Nos. 77 & 93.

(3) Defendants' joint motion to compel discovery. Docket No.
127.

(4) Ali's motions (Docket Nos. 72 & 111), and Hasan and
Dire's joint motions (Docket Nos. 81 & 94), to dismiss

Counts Nine, Ten, and Eleven of the Superseding Indictment for lack of jurisdiction.

(5) Ali and Hasan's separately filed motions to dismiss Counts Seven and Eight of the Superseding Indictment. Docket Nos. 114 (Ali) & 98 (Hasan).

(6) Ali and Hasan's separately filed motions to dismiss Counts Thirteen and Fourteen of the Superseding Indictment. Docket Nos. 115 (Ali) & 96 (Hasan).

(7) Ali and Hasan's separately filed motions to dismiss the Superseding Indictment pursuant to Rule 48(b) of the Federal Rules of Criminal Procedure and the Speedy Trial Act, 18 U.S.C. §§ 3161-74. Docket Nos. 117 (Ali) & 107 (Hasan).

(8) Ali and Hasan's separately filed motions for change of venue. Docket Nos. 113 (Ali) & 119 (Hasan).

(9) Ali and Hasan's motion _in limine_ to preclude any use of any statements of co-defendants. Docket No. 135.

(10) Ali's motions to dismiss all Counts of the Superseding Indictment for destruction/spoliation of evidence. Docket Nos. 70 & 112.

(11) Ali's motion for additional peremptory challenges. Docket No. 74.

(12) Ali's Motion to Dismiss or Consolidate Counts in the Superseding Indictment As Being Multiplicitous in Violation of the Double Jeopardy Clause of the Fifth Amendment. Docket No. 141.

The motions have been fully briefed, and the Court held an evidentiary hearing with respect to certain of the motions on September 10-11, 2010. The motions are now ripe for decision.

## I.  FACTUAL ALLEGATIONS[1]

Sometime in March 2010, Defendants set off from Somalia in a seagoing vessel in search of a merchant ship to attack and plunder. Shortly after midnight on the morning of April 1, 2010, somewhere on the high seas between Somalia and the Seychelles, Defendants sighted what they believed to be a merchant ship.  Defendants Hasan, Ali, and Dire thereafter boarded one of two small assault boats attached to the seagoing vessel and set out to attack the perceived merchant ship.  To facilitate their attack, Hasan carried a rocket-propelled grenade ("RPG"), and Ali and Dire each carried an assault rifle.  Defendants Gurewardher and Umar meanwhile remained on board the seagoing vessel to maintain the ship.

As the crew of the assault boat approached their target, Ali and Dire raised their assault rifles and opened fire on the vessel. To the surprise of Hasan, Dire, and Ali, what they had until then believed to be a merchant vessel quickly revealed itself to be the USS Nicholas, a United States Navy frigate.  After the USS Nicholas returned fire, Hasan, Dire, and Ali attempted to flee in their

---

[1] With the impending trial date in mind, and in the interest of affording the parties as much time as possible to prepare for that trial in light of the rulings contained in this Opinion and Order, the facts recited in this section are not drawn from testimony at the evidentiary hearing, but instead simply drawn from the allegations set forth in the Superseding Indictment. Consequently, this section is included only for purposes of providing general background, and does not constitute factual findings for any purpose.  Instead, the Court will discuss below in the context of each motion any relevant testimony from the evidentiary hearing.

small assault boat. The USS Nicholas gave chase, eventually capturing the boat, Hasan, Dire, and Ali. The USS Nicholas thereafter searched for, found, and captured the seagoing vessel, along with Gurewardher and Umar.

## II. PROCEDURAL HISTORY

On April 20, 2010, a federal grand jury returned a six-count Indictment against Defendants. Docket No. 1. The Indictment charged all five Defendants with: (1) Piracy under the Law of Nations, in violation of 18 U.S.C. §§ 1651 and 2; (2) Attack to Plunder Vessel, in violation of 18 U.S.C. §§ 1659, 3238, and 2; (3) Assault with a Dangerous Weapon in the Special Maritime Jurisdiction of the United States, in violation of 18 U.S.C. §§ 113(a)(3), 3238, and 2; (4) Conspiracy to Use Firearms During a Crime of Violence, in violation of 18 U.S.C. §§ 924(o) and 3238; and (5) two counts of Use of a Firearm During a Crime of Violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii), 3238, and 2. Defendants were arraigned on April 30, 2010, at which time they pled not guilty, and trial was set for July 6, 2010.

On May 20, 2010, the Court held a hearing pursuant to motions filed by the government to certify the case as complex under the Speedy Trial Act, 18 U.S.C. § 3161(h)(7)(B)(ii), and for a pretrial conference pursuant to § 2 of the Classified Information Procedures Act ("CIPA"), 18 U.S.C. app. 3 §§ 1-16, to address potentially discoverable classified information involved in the case. See

4

Docket Nos. 23 & 44. After hearing argument from the parties, the Court granted the government's motions, certifying the case as complex on the basis of logistical difficulties in obtaining evidence from the crew of the USS Nicholas, the possibility of classified information being involved in the case, and the novel and complex issues involved in the case. Accordingly, the Court continued the trial date to September 8, 2010. Written orders memorializing these rulings were entered by the Court later that same day and filed by the Clerk of this Court on the following day. Docket Nos. 58 & 59.

Thereafter, on July 7, 2010, a federal grand jury returned a Superseding Indictment charging Defendants with a total of fourteen counts. Docket No. 63. The Superseding Indictment comprised the six counts of the original Indictment plus eight additional counts: (1) Acts of Violence Against Persons on a Vessel, in violation of 18 U.S.C. §§ 2291(a)(6), 2290(a)(2), 3238, and 2; (2) Conspiracy to Perform an Act of Violence Against Persons on a Vessel, in violation of 18 U.S.C. §§ 2291(a)(9), 2290(a)(2), and 3238; (3) Assault with a Dangerous Weapon in a Special Maritime Jurisdiction of the United States, in violation of 18 U.S.C. §§ 113(a)(3), 3238, and 2; (4) two counts of Assault with a Dangerous Weapon on Federal Officers and Employees, in violation of 18 U.S.C. §§ 111(a)(1), 111(b), 3238, and 2; (5) Using, Carrying, and Possessing a Destructive Device in Relation to a Crime of Violence, in violation

5

of 18 U.S.C. §§ 924(c)(1)(A), 924(c)(1)(B)(ii), 3238, and 2; (6) Carrying an Explosive Device During the Commission of a Felony, in violation of 18 U.S.C. §§ 844(g)(2), 3238, and 2; and (7) Conspiracy to Carry an Explosive During the Commission of a Felony, in violation of 18 U.S.C. §§ 844(m) and 3238.

On July 16, 2010, Dire moved to continue the trial date on the Superseding Indictment to November 9, 2010, representing that no other defense counsel opposed the continuance. Docket No. 69. Hasan filed a response to Dire's motion, explaining that although Hasan did not object to the continuance, he explicitly reserved his objections to the timeliness of the Superseding Indictment itself under the Speedy Trial Act and the Federal Rules of Criminal Procedure. Without other objection, this Court granted Dire's motion to continue by order dated July 27, 2010, continuing the trial date to November 9, 2010.

## III. DISCUSSION

### A. The Motions to Suppress

Defendants move to suppress and exclude from evidence several statements made to authorities following Defendants' capture, arguing that the statements at issue were taken in violation of Defendants' rights under the Fifth Amendment to the United States Constitution. Defendants contend that they were never adequately advised of their trial rights, and that, even if they had been, they did not understand or comprehend the nature of those rights

6

such that they could knowingly and intelligently waive those rights. Defendants further contend that such statements were involuntary, and are inadmissible because they result from coercion and undue influence.

In response, the Government argues that Defendants were sufficiently advised of their Fifth Amendment rights and knowingly waived those rights prior to making the statements at issue, thus rendering the statements admissible at trial. The Government also represents that at no time were Defendants physically threatened or otherwise coerced, such that their statements could be deemed involuntary. For the reasons outlined below, and on the basis of the totality of the evidence presented at the evidentiary hearing, this Court **GRANTS** Gurewardher's motion to suppress the statements he made on April 2, 2010 and **DENIES** Defendants' motions to suppress the statements they made on April 4, 2010.

### 1. Applicable Law

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. In <u>Miranda v. Arizona</u>, the United States Supreme Court declared that a suspect in custody must be advised of such constitutional rights under the Fifth Amendment prior to any interrogation. <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966); <u>accord</u> <u>Dickerson v. United States</u>, 530 U.S. 428, 444 (2000) (reaffirming <u>Miranda</u> as a "constitutional rule that

Congress may not supersede legislatively"). The Fifth Amendment rights implicated by Miranda have been held to apply to citizens and non-citizens alike. See, e.g., United States v. Balsys, 524 U.S. 666, 671 (1998) ("Resident aliens . . . are considered 'persons' for purposes of the Fifth Amendment and are entitled to the same protections under the Clause as citizens.") (citing Kwong Hai Chew v. Colding, 344 U.S. 590, 596 (1953)); cf. Mathews v. Diaz, 426 U.S. 67, 77 (1976) (explaining that even a non-citizen "whose presence in this country is unlawful, involuntary, or transitory is entitled to [the] constitutional protection" of the Due Process Clauses of Fifth and Fourteenth Amendments); see also In re Terrorist Bombings of U.S. Embassies in E. Africa, 552 F.3d 177, 199-200 & n.16 (2d Cir. 2008), cert. denied, 129 S. Ct. 2765, 2778 (2009) (citing Balsys, 524 U.S. at 671). Moreover, although the Supreme Court has not yet ruled definitively on this specific issue, the United States Court of Appeals for the Second Circuit has noted that, in past cases, the Government has not contested that Fifth and Sixth Amendment protections apply even "to the custodial interrogation of a foreign national outside the United States by [U.S.] agents . . . engaged in a criminal investigation." United States v. Rommy, 506 F.3d 108, 131 (2d Cir. 2007), cert. denied, 552 U.S. 1260 (2008) (citing United States v. Bin Laden, 132 F. Supp. 2d 168, 185-89 (S.D.N.Y. 2001)); accord In re Terrorist Bombings, 552. F.3d at 199 n.15 (quoting Rommy, 506 F.3d

at 131); but see United States v. Verdugo-Urquidez, 494 U.S. 259, 269 (1990) ("we have rejected the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States"); Johnson v. Eisentrager, 339 U.S. 763, 783-85 (1950); United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 318 (1936).[2]

The Miranda warnings consist of advising a suspect:

> prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

Miranda, 384 U.S. at 479. However, Miranda does not require that any particular recitation of these warnings be given to a criminal defendant. See California v. Prysock, 453 U.S. 355, 359 (1981) (per curiam) ("This Court has never indicated that the 'rigidity' of Miranda extends to the precise formulation of the warnings given a criminal defendant."). Instead, in determining whether a suspect

---

[2] Since the capture, detention, and questioning of Defendants involved only U.S. personnel, this case does not implicate the issue of the admissibility in U.S. courts of statements taken by agents of foreign governments without Miranda warnings. See United States v. Yousef, 327 F.3d 56, 145-46 (2d Cir. 2003) (explaining that "the law is settled that statements taken by foreign police in the absence of Miranda warnings are admissible if voluntary," unless either "United States law enforcement agents actively participate[d] in [the] questioning conducted by foreign authorities," such that it could be considered a "joint venture" by U.S. and foreign authorities, or the statements were "obtained under circumstances that 'shock the judicial conscience'") (quoting United States v. Cotroni, 527 F.2d 708, 712 n.10 (2d Cir. 1975)).

has been adequately advised of his rights, "'[t]he inquiry is simply whether the warnings reasonably conve[yed] to a suspect his rights as required by Miranda.'" Florida v. Powell, 130 S. Ct. 1195, 1204 (2010) (alterations omitted and added and internal quotation marks omitted) (quoting Duckworth v. Eagan, 492 U.S. 195, 203 (1989)).

Of course, a suspect may waive his Fifth Amendment rights and voluntarily participate in a custodial interrogation. Miranda, 384 U.S. at 444. However, such waiver must be made "voluntarily, knowingly, and intelligently." Id. To be voluntary, the waiver must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception." Moran v. Burbine, 475 U.S. 412, 421 (1986). To be knowing and intelligent, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Id. However, "[t]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." Colorado v. Spring, 479 U.S. 564, 574 (1987). "The Miranda warnings protect this privilege by ensuring that a suspect knows that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." Id. Thus, Miranda rights are only waived "if the 'totality of the circumstances surrounding the interrogation' reveal both an

10

uncoerced choice and the requisite level of comprehension."
Burbine, 475 U.S. at 421 (quoting Fare v. Michael C., 442 U.S. 707,
725 (1979)).

The prosecution need not show that a waiver of Miranda was
express, but may instead show an implicit waiver through, for
example, "'the defendant's silence, coupled with an understanding
of his rights and a course of conduct indicating waiver.'"
Berghuis v. Thompkins, 130 S. Ct. 2250, 2261 (2010) (quoting North
Carolina v. Butler, 441 U.S. 369, 373 (1979)). However, "courts
must presume that a defendant did not waive his rights"—Butler, 441
U.S. at 373—and "a heavy burden rests on the government to
demonstrate that the defendant knowingly and intelligently waived
his" Fifth Amendment rights.    Miranda, 384 U.S. at 475.
Accordingly, a mere showing "that a Miranda warning was given and
the accused made an uncoerced statement . . . standing alone, is
insufficient to demonstrate 'a valid waiver' of Miranda rights."
Berghuis, 130 S. Ct. at 2261 (quoting Miranda, 384 U.S. at 475).

Finally, "[t]he requirement that Miranda warnings be given
does not, of course, dispense with the voluntariness inquiry."
Dickerson, 530 U.S. at 444. "A statement is involuntary under the
Fifth Amendment only if it is involuntary within the meaning of the
Due Process Clause." United States v. Braxton, 112 F.3d 777, 780
(4th Cir. 1997).  The test for identifying whether a statement is
involuntary is to determine whether the statement was "'extracted

11

by any sort of threats or violence, (or) obtained by any direct or implied promises, however slight, (or) by the exertion of any improper influence." Hutto v. Ross, 429 U.S. 28, 30 (1976) (quoting Brady v. United States, 397 U.S. 742, 753 (1970)). Before a statement can be deemed involuntary, there must be some showing of "coercive police activity." Colorado v. Connelly, 479 U.S. 157, 167 (1986). "The mere existence of threats, violence, implied promises, improper influence, or other coercive police activity, however, does not automatically render a confession involuntary." Braxton, 112 F.3d at 780. Instead, the crux of the voluntariness inquiry "is whether the defendant's will has been 'overborne' or his 'capacity for self-determination critically impaired.'" United States v. Pelton, 835 F.2d 1067, 1071-72 (4th Cir. 1987) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973)). In conducting this inquiry, a court should look to "the 'totality of the circumstances,' including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." Id. (quoting United States v. Wertz, 625 F.2d 1128, 1134 (4th Cir. 1980)).

## 2. Analysis

Although Defendants seek to suppress all statements they made to authorities, the Government has clarified that it will seek to admit only three sets of statements: (1) statements made by Gurewardher on April 2, 2010; (2) statements made by Defendants on April 4, 2010; and (3) statements by Defendants relating to

"booking information," such as identity, age, birthplace, and place of residence, which generally are not subject to Miranda. Defendants appear only to contest the admissibility of statements made on April 2 and 4, 2010, and not the statements made relating to "booking information."

### a. The April 2, 2010 Interview of Gurewardher

On April 2, 2010, while Defendants were in custody on board the USS Nicholas, Lieutenant Junior Grade Chad Hutchins, an officer on the USS Nicholas, and Special Agent Michael Knox of the Naval Criminal Investigate Service ("NCIS"), who was also on board the USS Nicholas, arranged to have Aziz Ismail, a translator on board another United States Navy vessel (the USS Farragut), translate interviews with certain of the Defendants by means of satellite telephone. Docket Nos. 165-66 (Hr'g Tr.[3]) at 56:3-57:2 (Hutchins Test.), 247:4-248:8 (Knox Test.); accord 421:2-13 (Ismail Test.). Mr. Ismail is a Somali-born man who grew up and attended school in the Mogadishu area of Somalia, left his native country when he was about seventeen-and-a-half years old, and is now a naturalized U.S. citizen. Id. at 411:3-18; 413:21-24; 415:8-11. Mr. Ismail speaks

---

[3] Docket Number 165 is Volume 1 of the transcript of the evidentiary hearing, and comprises the proceedings on September 9, 2010. Docket Number 166 is Volume 2, comprising the proceedings on September 10, 2010. Despite these separate docket entries, the transcripts' internal pagination is consecutive, the former comprising pages 1 through 257, and the latter comprising pages through 258 through 513. For the sake of expedience, the Court's citations to the transcript shall refer only to its internal pagination, without regard to whether the page or pages cited are actually contained in Volume 1 or 2.

the same dialect of Somali that Defendants speak. Id. at 413:5-20. After passing a set of language examinations, Mr. Ismail began working as a translator as part of the United States Navy's counter-piracy operations. Id. at 415:17-421:1.

The satellite phone calls took place on the evening of April 2, 2010, outside on the forecastle of the USS Nicholas. Id. at 57:4-6 (Hutchins Test.), 59:2-8, 249:18-19 (Knox Test.). In addition to Special Agent Knox and Lt. Hutchins, Intelligence Specialist Joseph Vellucci, Master at Arms First Class Jacob Smith, and Electronics Technician First Class Rolando Roblesnavarro were present on deck during the satellite phone calls. Id. at 57:7-58:3 (Hutchins Test.), 179:1-11 (Smith Test.), 213:6-17 (Vellucci Test.). During the calls, each Defendant was seated in the open, on an empty missile launcher base, without handcuffs, and without armed guards in the immediate vicinity. Id. at 59:8-15 (Hutchins Test.), 59:23-60:5, 62:25-63:24, 180:5-18 (Smith Test.), 248:16-249:2 (Knox Test.). Lt. Hutchins indicated that the Defendants, including Gurewardher, had not been prepared, questioned, threatened, or coerced in any way in advance of the satellite phone calls. Id. at 60:6-11 (Hutchins Test.), 65:9-15.

Special Agent Knox advised Mr. Ismail of the circumstances, and instructed Mr. Ismail to ask each detainee interviewed what they had been doing prior to their capture. Id. at 248:3-8 (Knox Test.), 421:24-25 (Ismail Test.), 422:19-25. Special Agent Knox advised Ismail first to tell each Defendant to return the satellite

phone to Knox if that Defendant did not wish to speak about the incident. Id. at 248:9–15 (Knox Test.), 422:1–18 (Ismail Test.) (Mr. Ismail explaining that the first thing Knox told him to tell Defendants was that if they did not want to talk with him, they could go back to their holding area), 428:4–10. Only Hasan, Dire, and Gurewardher were interviewed by satellite phone on April 2, 2010. See id. at 61:12–62:2 (Hutchins Test.) (Lt. Hutchins acknowledging that although he only remembers satellite phone interviews with Hasan and Dire, it is possible that he had forgotten an additional interview between those two), id. at 213:18–214:3 (Vellucci Test.), 218:6–8, 219:7–9, id. at 250:16–251:3 (Knox Test.) (Special Agent Knox acknowledging that he has no independent recollection of a satellite phone interview of Hasan, despite the fact that others' notes reflect it), id. at 423:7–424:3 (Ismail Test.) (Mr. Ismail indicating his belief that he spoke with Ali and Umar), 427:8–428:1 (Mr. Ismail identifying Gurewardher as the third Defendant he spoke with). There is no evidence that any of those Defendants exhibited any reluctance to speak with Mr. Ismail via the satellite phone. Id. at 249:6–7 (Knox Test.), 424:18–23 (Ismail Test.), 428:21–23. Hasan and Dire both represented that they were fishermen who had been kidnapped by the other Defendants and forced to engage in piracy, and Ismail indicated to Special Agent Knox that he did not believe them, because Ismail "hears that same story every day." Id. at 58:12–19 (Hutchins Test.), 61:5–11, 215:6–16 (Vellucci Test.), 217:1–218:20,

15

231:4–25, 422:22–423:6 (Ismail Test.), 424:18–426:10.  However, Gurewardher immediately confessed to being a pirate and engaging in piratical operations.  Id. at 62:1–13 (Hutchins Test.), 219:13–22 (Vellucci Test.), 251:20–24 (Knox Test.), 428:15–430:5 (Ismail Test.).  This account of the conduct of the satellite phone calls was generally corroborated by the other witnesses.  See Hr'g Tr. at 58:12-19 (Hutchins Test.), 179:16–182:2 (Smith Test.), 214:5–215:5 (Vellucci Test.).

Gurewardher argues that, prior to his satellite phone conversation with Mr. Ismail on April 2, 2010, Special Agent Knox failed to advise him adequately of his Fifth Amendment rights, as required by Miranda.  The record currently before the Court shows this argument to be correct. Although Special Agent Knox told Mr. Ismail to advise Gurewardher that he should return the satellite phone to Knox if he did not wish to speak about the events leading up to the capture, such an admonition is clearly inadequate to satisfy the requirements of Miranda.  It in no way conveyed to Gurewardher his right to remain silent, that anything he said could be used against him in a court of law, that he had the right to an attorney, and that an attorney would be provided if he could not afford one.  Accordingly, in the absence of any applicable exception to the Miranda requirement, Gurewardher's statements to Mr. Ismail through the satellite phone on April 2, 2010 should be suppressed.

16

The Government argues that <u>Miranda</u> does not apply to the April 2, 2010 telephonic interview of Gurewardher because the interview was (1) non-custodial, (2) conducted as part of military intelligence gathering, as opposed to a criminal investigation, and (3) subject to the "public safety" exception to the <u>Miranda</u> requirement. Although this Court certainly does not take these arguments, and in particular the "public safety" argument, lightly, the Court nevertheless has concluded that none has sufficient merit to except the April 2, 2010 statements from <u>Miranda</u>.

First, a suspect is in custody for <u>Miranda</u> purposes when there is a "'formal arrest or restraint on freedom of movement.'" <u>United States v. Conley</u>, 779 F.2d 970, 973 (4th Cir. 1985) (quoting <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983) (per curiam)). The Government does not "dispute that in any colloquial, factual sense, of course they're in custody from the moment that they're captured, handcuffed, brought on board, kept handcuffed most of the time." Hr'g Tr. at 99:24–100:2 (colloquy between counsel for the Government and the Court); <u>accord id.</u> 94:19–95:3, 98:13–102:17. Nevertheless, the Government continues to maintain that, despite the facts of Defendants' captivity on board the USS Nicholas, Gurewardher's satellite phone call on April 2, 2010 was not custodial for <u>Miranda</u> purposes because Gurewardher "was less restrained and more free to go because he wasn't handcuffed and he's given a phone and talks for a few minutes on a sat phone and goes back." <u>Id.</u> at 102:4–6.

17

The Government's argument is not without some merit, but the Court simply cannot agree with it. Although the evidence before the Court at this time suggests that Defendants were, in fact, safely and humanely treated during their time on board the USS Nicholas, and were not subjected to any abuse, threats, or mistreatment, the fact remains that Gurewardher was detained in handcuffs and under constant guard by armed sailors on the USS Nicholas in the middle of the high seas. The assault boat on which the other Defendants had been found had been sunk—see id. at 71:4–6 (Hutchins Test.)—and the so-called mother ship on which Gurewardher had been found was, at that time, being towed by the USS Nicholas. See id. at 71:7–72:22. Gurewardher was clearly restrained from moving freely and was therefore "in custody" for Miranda purposes. Although Gurewardher was admittedly not handcuffed during the satellite phone call, and Special Agent Knox gave Gurewardher the option not to speak with the interpreter, the alternative was simply to be handcuffed again and escorted by armed guards back to his detention area on the ship. That can hardly be characterized as "'freedom to depart.'" Conley, 779 F.2d at 973 (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (per curiam)); see also Hr'g Tr. at 112:16–24 (Hutchins Test.) (Lt. Hutchins testifying on cross-examination that Gurewardher was not free to leave, because "[h]e would have [fallen] in the ocean"). Even if Gurewardher had been permitted to disembark from the USS Nicholas—he could not actually have done so in the middle of the Indian Ocean.

Although the circumstances presented here bear some factual resemblance to the prison context addressed by the United States Court of Appeals for the Fourth Circuit in Conley, the Court finds that case distinguishable. First, Conley involved a prison inmate being questioned as a witness to suspected criminal activity unrelated to the criminal activity for which he was incarcerated at that time. 779 F.2d at 972. In this regard, it must be observed that the potential for intimidation attendant to a custodial environment is significantly diminished in "the paradigmatic custodial prison setting where, by definition, the entire population is under restraint of free movement." Id. at 973. In other words, the prison is the prisoners' "community" for the duration of their sentence. Absent some significant additional imposition on a prisoner's movements, the mere fact that the questioning takes place in this setting does not carry with it the risk of additional intimidation that it might for, say, a person who is not already serving a sentence in prison. In other words, for prisoners, the prison setting becomes the baseline against which the potential for intimidation is measured.

In a closely related vein, it must be noted that in the context of Conley, the defendant's imprisonment was not in any way dependent upon, or even related to, the subject matter or the outcome of the questioning at issue. The defendant there was in prison due to a prior adjudication and sentencing to a term of imprisonment. Although there are certainly circumstances in which

questioning about unrelated matters can have an impact on the length of the term a defendant is serving—see Fed. R. Crim. P. 35(b)—such an impact still does not alter the separate underlying basis for the defendant's imprisonment.

Neither of the circumstances discussed above is implicated here. Gurewardher was not a previously adjudicated criminal serving a term of imprisonment on board the USS Nicholas. Instead, Gurewardher was captured on April 1, 2010, shortly after the alleged attack on the USS Nicholas, and detained on board as a suspect in that attack. The April 2, 2010 satellite phone call related to that attack—i.e., to the sole basis for Gurewardher's detention on board. Unlike the prison in Conley, the USS Nicholas clearly was not Gurewardher's "community," the baseline against which the potential for intimidation is measured.

The Fourth Circuit also noted in Conley that the defendant there was well acquainted with his guard-questioners, and had even worked for one of them for several months, no doubt significantly diminishing the risk of intimidation and coercion. Id. at 974. In fact, it was Conley who initiated the discussion with the guard for whom he had previously worked. However friendly Defendants might have become with the crew of the USS Nicholas during the course of their detention—see, e.g., Hr'g Tr. at 76:9—17 (Hutchins Test.), 288:10—14 (Knox Test.)—this encounter took place the day after capture, and there obviously was no relationship antecedent to their capture and detention that would have lessened the potential

20

for intimidation. Therefore, the Court finds that the circumstances of the April 2, 2010 satellite phone calls rendered them custodial interviews for purposes of <u>Miranda</u>. Accordingly, Gurewardher should have been advised of his Fifth Amendment rights prior to questioning.

The Court next turns to the Government's second argument, that the requirements of <u>Miranda</u> do not apply to interrogations conducted by NCIS agents on board a United States Navy vessel for the purpose of obtaining military intelligence. In support of its argument that <u>Miranda</u> does not apply to questions in furtherance of military counter-piracy operations, the Government relies on the Fourth Circuit's decision in <u>United States v. Martindale</u>, 790 F.2d 1129 (4th Cir. 1986). In <u>Martindale</u>, the Fourth Circuit held that <u>Miranda</u> did not apply to exclude use, in a United States prosecution, of statements made during the course of an interrogation conducted by British officers pursuant to an investigation into the defendant's suspected violation of British law. <u>Martindale</u>, 790 F.2d at 1131. The court reasoned that <u>Miranda</u> was intended as a deterrent to unlawful police interrogations, and that when an interrogation is conducted by authorities in a foreign jurisdiction as part of a separate investigation under foreign law, "the exclusionary rule has little or no effect upon the conduct of foreign police." <u>Martindale</u>, 790

F.2d at 1132 (quoting <u>United States v. Chavarria</u>, 443 F.2d 904, 905 (9th Cir. 1971)).

Although this Court obviously takes no issue with the reasoning of <u>Martindale</u>, that reasoning simply does not apply to the April 2, 2010 satellite phone interview of Gurewardher or, indeed, to this case, in general. In contrast to the British officers at issue in <u>Martindale</u>, the exclusionary rule certainly <u>can</u> have a deterrent effect on the conduct of NCIS agents, who are United States law enforcement personnel acting on a United States Navy vessel, which is an extension of the territory of the United States even when on the high seas.[4] Indeed, the very facts of this case demonstrate the Government's sensitivity to <u>Miranda</u> even in these circumstances. As discussed below in greater detail in the context of the April 4, 2010 interviews, once Special Agent Knox had been advised that Defendants were likely going to be prosecuted domestically, rather than in Kenya, as he originally believed, he prepared to (and did) recite to Defendants, through an interpreter, a modified version of the <u>Miranda</u> warning as well as a "cleansing statement" provided to him by Government prosecutors. These facts

---

[4] <u>See</u> <u>United States v. Flores</u>, 289 U.S. 137, 155-56 & n.9 (1933) ("'vessels of a nation [are] parts of its territory, though at sea, as the State retains its jurisdiction over them'") (quoting 6 Daniel Webster, <u>Webster's Works</u> 306, 307); <u>see also</u> <u>United States v. Rodgers</u>, 150 U.S. 249, 264 (1893) ("a vessel is deemed part of the territory of the country to which she belongs"); <u>United States v. Collins</u>, 7 M.J. 188, 189 (C.M.A. 1979) ("'a United States Naval Ship of the line is always part of the soil of the United States'") (referencing trial court's ruling); 44B Am.Jur.2d <u>International Law</u> § 87 (2007).

demonstrate that Special Agent Knox believed—or was instructed by his superiors—that Miranda required him to provide such warnings, and he was obviously concerned that if such warnings were not provided, that any statements made by Defendants would be excluded from use at trial pursuant to the exclusionary rule. The Government's assertion that Miranda did not apply to Gurewardher's satellite phone interview because it was conducted as part of a military counter-piracy operation, in which the exclusionary rule could have no effect, is thus unavailing.

The Court acknowledges, of course, that the circumstances of this case could have led to dual-purpose interviews; i.e., questioning that simultaneously constituted both military intelligence gathering and criminal investigation. The officers and crew of the USS Nicholas clearly had legitimate and weighty concerns other than the eventual criminal prosecution of Defendants in the immediate hours (and perhaps even days) after the capture of Defendants. See Hr'g Tr. at 55:12—56:2 (Hutchins Test.), 242:22—243:6 (Knox Test.), 245:9—22. In such a case, the Court would presumably have had to look to the objective nature of the questioning to determine whether or not the context necessitated Miranda warnings. However, the evidence currently before the Court portrays a course of events in which the criminal nature of the investigation manifested early on, and predominated over any intelligence gathering aspects of the satellite phone interviews.

Lt. Hutchins explained that "[t]here were talks pretty much the morning or evening of the 1st is when we first realized that the Department of Justice wanted to take custody of the individuals." Hr'g Tr. 54:16-18. In other words, Lt. Hutchins's testimony confirmed that "even on the night of the 1st [of April, 2010—i.e., the night after Defendants were captured], at least the idea of a United States federal prosecution came up," and that "a for-sure answer" was that by the "very next day on the 2nd [of April, 2010]" the USS Nicholas had gotten "word that the United States had decided to attempt to charge the five defendants with federal crimes." Id. at 54:20-23, 55:6-9; but see id. at 253:5-254:1 (Knox Test.) (Special Agent Knox indicating that he first was advised of the possibility of domestic prosecution after the April 2, 2010 satellite phone calls), 306:6-308:13.

Regardless of the precise time at which the personnel on board the USS Nicholas became aware of the decision to pursue domestic prosecution of these Defendants, the facts currently before the Court appear to demonstrate that there was, in fact, little actual intelligence gathering conducted with respect to these Defendants at any time in the days following the alleged attack. Although Intelligence Specialist Vellucci's participation in the April 2, 2010 satellite phone calls might arguably support the Government's claim of intelligence gathering, Vellucci himself agreed on cross-examination that during the April 2, 2010 satellite phone calls, he was "not functioning as an intelligence specialist in [that]

24

capacity," but instead "predominantly" was "simply assisting Special Agent Knox as a notetaker." Hr'g Tr. at 232:7—10 (Vellucci Test.). Needless to say, the Government has no basis for asserting this ground with respect to the April 4, 2010 interviews discussed below: Vellucci did not participate in them, at all, because, in his own words, those interviews "were part of the criminal investigation," and Vellucci "was there strictly in an intelligence capacity, and . . . [his] presence was not required." Compare id. at 220:7—16 (Vellucci Test.), with id. at 220:21—223:2 (Vellucci explaining how he prepared a very brief intelligence report from the notes he took during the April 2, 2010 satellite phone calls, containing little more than the biographical information of Defendants). Accordingly, the Court is simply not faced here with a situation in which the military intelligence-gathering nature of the interviews at issue rendered Miranda inapplicable.

Third, the Government argues that even if United States Navy counter-piracy operations abroad are subject to Miranda's requirements, Gurewardher's statements in response to the April 2, 2010 telephone interview would be admissible pursuant to the "public safety" exception. The "public safety" exception permits authorities to question a suspect prior to issuing the Miranda warnings in circumstances where there is an "objectively reasonable need to protect the police or the public from [an] immediate danger." New York v. Quarles, 467 U.S. 649, 659 n.8 (1984). The Government argues that the USS Nicholas was uncertain of the

25

Defendants' motives in perpetrating the surprise attack, noting the possibility of terrorist involvement, and had reason to believe that, whatever the motives, a third vessel tracked on radar during the attack might have remained in the vicinity, preparing to launch another attack. See Hr'g Tr. at 55:12—56:2 (Hutchins Test.), 242:22—243:6 (Knox Test.), 245:9—22, 311:5—13.

As noted above, the Court is certainly not dismissive of the Government's arguments in this connection. However, the Court believes certain facts before it tend to show that this is simply not the paradigmatic case in which the narrow "public safety" exception would apply. Of particular note in this connection is the fact that the satellite phone conversations did not occur until a day and a half after being captured.[5] In order for the limited "public safety" exception to apply, there must be an immediate threat to either law enforcement or the public. See Quarles, 467 U.S. at 659 n.8 (stating that an "immediate danger" must be present for the "public safety" exception to apply). Although it could be argued that, in the absence of an interpreter on board the USS Nicholas, arrangements with Mr. Ismail were made as expeditiously as possible, the Court notes that the nature of the questioning does not suggest a "ticking time bomb" scenario in which specific

_____

[5] Hasan, Ali, and Dire were captured after midnight on April 1, 2010—see Hr'g Tr. at 16:2—10 (Hutchins Test.), 22:20—23:2, 30:6—31:3—and Gurewardher and Umar were captured early after sunrise on that same day. Id. at 32:13—17. The satellite phone calls were conducted after dark on the evening of April 2, 2010. Id. at 57:3—4 (Hutchins Test.), 247:6—8 (Knox Test.), 248:24.

information is urgently sought. Although there might well have
been justified concerns about the whereabouts and intentions of the
third boat detected on radar during the attack, there does not
appear to be any concerns here about "hidden traps and discarded
weapons" that may injure law enforcement officers or the public.
United States v. Mobley, 40 F.3d 688, 692 (4th Cir. 1994).
Instead, the satellite phone calls consisted of eliciting basic
biographical information from Defendants and asking them what they
were doing out on the high seas, without extensive follow-up or
more specific inquiries directed toward concerns of "immediate
danger." See, e.g., Hr'g Tr. at 228:13—17 (Vellucci Test.),
230:25—15, 233:5—21.

Moreover, it must be remembered that the USS Nicholas was,
after all, engaged in a counter-piracy operation at the time of the
alleged attack. Although unprovoked gunfire from an unknown vessel
is likely always surprising, though perhaps less so in times and
theaters of war, that the USS Nicholas's alleged altercation with
Defendants was, in a sense, precisely the type of encounter that
the USS Nicholas was patrolling for, not a surprise terrorist
attack. Indeed, as the Government has stipulated, on the date(s)
of the alleged attack, "the USS NICHOLAS . . . used lighting on the
ship to give the appearance that the USS NICHOLAS . . . was a
merchant vessel." Docket No. 148 at 2. Among the principal tasks
and goals of a counter-piracy operation is, of course, to engage
and capture pirates. While the facts of this case may seem novel

27

to the public and media in the United States, to a warship actively engaged in a counter-piracy operation, the facts of this case are closer to an "ordinary and routine arrest scenario." Mobley, 40 F.3d at 693.

It bears noting that the Court can certainly conceive of circumstances in which an attack on a ship would render the "public safety" exception applicable. For example, had the USS Nicholas been attacked in the manner alleged in this case while in port, with land and/or other vessels in the vicinity, its ability to flee and/or engage its attackers might have been compromised (at least, without risking damage to its surroundings or third-party casualties). In such circumstances, the ship's vulnerability to further attacks might well justify questioning without Miranda warnings to ascertain the nature of the initial attack and the potential for such further attacks. Here, however, the USS Nicholas was far out to sea, having successfully used radar to detect Defendants' vessels and likely able to use radar and night-vision capabilities to detect other potentially hostile vessels from which to flee (or to pursue, as it actually did in this case with respect to the mother ship), and able to use appropriate weaponry to engage (and, indeed, subdue and capture) its attackers without endangering the safety of third parties. While the Court is in no way suggesting a bright-line distinction between the port and high seas contexts for purposes of applying the "public safety"

exception, the circumstances of this case simply do not appear to warrant application of such exception.

For all of the foregoing reasons, the Court concludes that Gurewardher's April 2, 2010 satellite phone call was a custodial interview to which <u>Miranda</u> applied, and no exception to the <u>Miranda</u> requirement has been demonstrated. Consequently, the Court will **GRANT** Gurewardher's motion to suppress his statements made during the April 2, 2010 satellite phone interview, and exclude such statements from trial.

### b. The April 4, 2010 Interviews of Defendants

On April 4, 2010, the interpreter, Mr. Ismail, and NCIS Special Agent Theodore F. Mordecai were helicoptered from the USS Farragut to the USS Nicholas to assist in the questioning of the Defendants. Hr'g Tr. at 66:14–24 (Hutchins Test.), 384:18–385:8 (Mordecai Test.), 431:2–9 (Ismail Test.). Prior to the interviews, Special Agent Knox had been advised of the possible domestic prosecution of Defendants, and had been provided earlier that day via email with a "cleansing statement" to read to Defendants to ensure they knew they had a right to remain silent even though some of them had already spoken with Knox and others on the USS Nicholas. <u>See id.</u> at 253:5–254:1 (Knox Test.). Special Agent Knox acknowledged by reply email his receipt of the "cleansing statement" and his understanding that he was to provide it to each Defendant. <u>See</u> Hr'g Ex. D3B; <u>see also</u> Hr'g Ex. D3C (subsequent email from Knox). Defendants were brought to the centerline

29

passageway to be interviewed, individually, by Special Agents Knox and Mordecai, with the translation assistance of Mr. Ismail. <u>See, e.g.</u>, Hr'g Tr. at 67:19—68:4 (Hutchins Test.), 113:25—117:5, 387:2—16 (Mordecai Test.). Lt. Hutchins, Master at Arms Smith, and Electronics Technician Roblesnavarro were also present in the centerline passageway, but were not directly involved in the conduct of the interviews. <u>Id.</u> at 116:10—20 (Hutchins Test.), 182:10—22 (Smith Test.), 203:11—21 (Roblesnavarro Test.), 206:6—14, 210:15—24, 267:10—13 (Knox Test.). Neither the agents nor the interpreter were visibly armed, and the only armed personnel were several feet away, and only in the vicinity when detainees came and went. <u>See</u> <u>id.</u> at 191:14—20 (Smith Test.), 206:15—207:19 (Roblesnavarro Test.), 267:10—18 (Knox Test.).

Defendants were individually brought in to be interviewed, and then a group interview was conducted at the end. <u>See, e.g.</u>, <u>id.</u> at 121:5—9 (Hutchins Test.). During the interviews, Defendants were handcuffed but not blindfolded. <u>See, e.g.</u>, <u>id.</u> at 115:14—116:1 (Hutchins Test.), 122:24—4. Special Agent Knox, speaking through Ismail, recited from memory a number of warnings at the outset of each Defendant's interview. <u>See</u> <u>id.</u> at 274:20—275:1 (Knox Test.), 278:1—4, 281:8—10, 283:11—13. First, he advised each Defendant "that they have the right to remain silent; that at any time they could be, request to be taken back to their holding area, and that I told them that if they wanted a lawyer, we would give them one." <u>Id.</u> at 264:6—9 (Knox Test.). Special Agent Knox explained that he

intentionally modified his articulation of their right to attorneys because he "knew getting a lawyer on the ship was impossible." Id. at 264:10–22; see also id. at 352:15–22. He then read each Defendant the "cleansing statement" with which he had been provided, "slightly modified to fit the situation," as follows:

> I know you have or may have previously spoken with me or someone else since you were taken into custody. It is possible that the statements you previously made may not be admissible against you in a court of law. A court would decide whether they are admissible. In other words, a court would decide that the statements cannot be used against you. I want you to understand that the interview with me today is a new interview. Just because you talked to me or someone else before does not mean you have to do so today. If you choose to talk to me today, anything you say can be used against you in court.

Id. at 265:15–266:10; accord Government Hr'g Ex. 3.[6]

Special Agent Knox specifically recalled that he had to stop Gurewardher from beginning to talk at least twice so that he could

---

[6] The text of the "cleansing statement" provided to Special Agent Knox by email reads as follows:

> I know you have previously spoken with me and with other people after you were taken into custody. It is possible that the statements you previously made to me or others may not be admissible against you in a court of law. A court would decide whether they are admissible; in other words, a court could decide that those statements could not be used against you. What I want you to understand is that this interview with me today is a new interview. Just because you talked to me or someone else before does not mean you have to do so again today. If you want to talk to me today, what you say during this interview can be used against you in a court of law.

Government Hr'g Exs. 1 & 4. It does not appear to the Court that any of the minor modifications made by Special Agent Knox to the precise wording of the "cleansing statement" affected its substance in any way that might be considered adverse to Defendants.

finish giving him his rights. See Hr'g Tr. at 269:5—14. The other
Government witnesses all corroborated the fact that Special Agent
Knox administered warnings to Defendants, although their
recollections of the warnings varied slightly. See 389:5—15
(Mordecai Test.) (Special Agent Mordecai indicating that "Special
Agent Knox gave each suspected pirate their Miranda rights"),
119:2—22 (Hutchins Test.) (Lt. Hutchins indicating that he was
familiar with the Miranda warnings and heard Special Agent Knox
"doing the Miranda . . . a few times," but admitting that he could
not recall whether it was done with every Defendant, including
Gurewardher), 151:15—18, 182:19—183:11 (Smith Test.) (Master at
Arms Smith indicating that he remembers "Special Agent Knox talking
through the interpreter, talking some form of like Miranda rights,
talking about, A, if, you know, anything you say, you know, can be
used against you, something of that nature"), 188:8—189:1; cf. id.
at 135:11—136:6 (Hutchins Test.), 151:9—14, 190:5—13 (Smith Test.),
205:2—206:14 (Roblesnavarro Test.) (Roblesnavarro indicating that
he did not remember hearing Miranda warnings being issued, but
acknowledging that Special Agent Knox had a piece of paper "that
had a Miranda right statement on it"); compare id. at 434:14—437:23
(Ismail Test.) (Mr. Ismail indicating that he recalls translating
both an explanation by Special Agent Knox that Defendants had the
right not to say anything and the written "cleansing statement" as
read by Knox, but also indicating that the warnings were not
delivered as they are on television) with id. at 472:15—473:12 (Mr.

Ismail acknowledging that he may have translated warnings relating to the use of statements in court and the availability of an attorney for Defendants, but simply does not recall).

Mr. Ismail testified that he asked each Defendant at the conclusion of those warnings if that Defendant understood, and each Defendant nodded and/or said "yes" in Somali. Id. at 438:4–439:2 (Ismail Test.); cf. id. at 270:4–18 (Knox Test.) (Special Agent Knox indicating that he did not recall Gurewardher verbally responding as to whether he understood), 271:6–13, 275:8–10, 281:14–19, 283:17–18, 340:18–24, 390:8–391:2 (Mordecai Test.) (Special Agent Mordecai indicating that he had not noticed any question about whether Defendants understood their rights and "never heard any of the suspected pirates say yes, but [he] did see head nodding as acknowledging, yes"). Furthermore, none of the Government personnel perceived anything indicating that any of the Defendants had not understood the warnings. Id. at 269:22–270:3 (Knox Test.), 271:1–5, 275:5–7, 277:3–8, 278:5–15, 281:11–19, 283:14–24, 340:18–24, 403:2–404:3 (Mordecai Test.), 439:16–21 (Ismail Test.); cf. id. at 408:21–409:2 (Mordecai Test.). Moreover, at no point did any of the Defendants show any sign of reluctance or confusion. Id. at 68:23–69:16 (Hutchins Test.), 174:24–175:13 (Smith Test.), 390:11–13 (Mordecai Test.), 439:22–440:5 (Ismail Test.). Mr. Ismail also noted the unusually friendly tone of the interviews. Id. at 440:22–441:6 (Ismail Test.).

Only Ali and Dire initially claimed to having been forced to participate in the attack, but eventually, upon a few minutes of questioning, each Defendant admitted to being a "pirate," and Hasan, Ali, and Dire each admitted to specific roles in the attack on the USS Nicholas and re-confirmed their respective roles in a group interview setting at the end. See id. at 273:10–12 (Knox Test.), 277:9–14, 278:16–280:23, 282:7–17, 284:7–21, 285:13–286:12

### i. The Adequacy of Special Agent Knox's Warnings

Defendants argue that the warnings given by Special Agent Knox on April 4, 2010 did not satisfy the requirements of Miranda. Defendants also argue that, because Special Agent Knox did not read the initial warning from a prepared statement, as is typically done, it is unclear exactly what warning was provided to Defendants. Defendants further argue that, in any event, Special Agent Knox's warning with respect to Defendant's right to counsel was inadequate because it failed to advise Defendants that they could have counsel present prior to and during interrogation.

Defendants' arguments are unavailing. Although counsel for Defendants made much at the evidentiary hearing of the fact that the April 4, 2010 interviews were not video-recorded, despite the availability of video recording equipment on the USS Nicholas, and that Special Agent Knox's notes refer only to the "cleansing statement," and not to the oral Miranda warnings he gave from memory, they provide no basis for any claim of a constitutional requirement that the Miranda warnings be recorded by audio, video,

34

or memorialized in a written record. Indeed, Special Agent Mordecai testified that video-recording interviews is not typical of the NCIS, and that he had never himself had an interview of a suspected pirate video-recorded. See Hr'g Tr. at 386:4–16 (Mordecai Test.). While it is certainly true that a video and/or audio recording would likely have shed significant light on this issue, the Court may ascertain the adequacy of Special Agent Knox's warnings based on the testimony provided at the evidentiary hearing. Special Agent Knox is an experienced NCIS agent who convincingly testified that he has given Miranda warnings approximately 500 times and can recite them from memory. Id. at 237:23–238:12 (Knox Test.), 262:14-264:2, 360:7-17. Despite the slight variations in the recollections of the various witnesses, the Court finds the testimony offered by the Government to be substantially consistent and credible, and to establish as a factual matter that Special Agent Knox did, in fact, administer the warnings he recalled to each of the Defendants at the beginning of each of their interviews on April 4, 2010.

Moreover, no deficiency appears to exist in Special Agent Knox's modified warning with respect to Defendants' right to an attorney. Although Special Agent Knox only advised Defendants that counsel would be provided to them if they wanted one, and therefore did not specify that Defendants had the right to the presence of an attorney prior to questioning, the Fourth Circuit has held that such a general warning with respect to the right to counsel is

35

adequate to satisfy the requirements of <u>Miranda</u>. <u>See</u> <u>United States</u> <u>v. Frankson</u>, 83 F.3d 79 (4th Cir. 1996) (finding that the formulations "you have the right to an attorney" and "[I]f you cannot afford an attorney, the Government will get one for you" satisfy <u>Miranda</u>, despite their failure to mention that the right to an attorney applies prior to interrogation.). Accordingly, Special Agent Knox's <u>Miranda</u> warnings and "cleansing statement" prior to the April 4, 2010 in-person interviews comport with the requirements set forth in <u>Miranda</u>.

## ii.  The Defendants' Knowing and Intelligent Waiver

Defendants next argue that, even if they were adequately warned in accordance with <u>Miranda</u> at the outset of the April 4, 2010 interviews, there is no evidence to suggest that they knowingly and intelligently waived their Fifth Amendment rights against self-incrimination. Defendants argue that, as non-English speaking and illiterate Somali nationals, without any connection to the United States, they would have lacked any understanding of the existence and nature of the rights available to them under the Fifth Amendment even after having the rights recited to them in their own language. Defendants argue that Somalia's government is barely functional, attorneys are uncommon there, and individual freedoms protecting persons who wish to refuse to answer questions from authorities are foreign and incomprehensible concepts.

Although the Court is, of course, sympathetic to the claimed conditions in Somalia, and finds there to be some merit to

Defendants' arguments in this connection, for the reasons stated below, the Court finds that the totality of the circumstances in this case demonstrates that Defendants did, in fact, knowingly and intelligently waive their rights. Consequently, their statements during the April 4, 2010 interviews were made in conformity with <u>Miranda</u>, and may not be excluded from trial on that basis.

In addressing the question of whether Defendants knowingly and intelligently waived their Fifth Amendment rights, this Court looks first to the Supreme Court's recent decision in <u>Berghuis v. Thompkins</u>. In <u>Berghuis</u>, the Court held that a defendant implicitly waived his right to remain silent by responding to questions during an interrogation under circumstances that did not indicate coercion on the part of authorities. 130 S. Ct. at 2263-64. In analyzing whether the defendant had waived his Fifth Amendment rights, the Court first found there to be sufficient evidence demonstrating that the defendant understood his <u>Miranda</u> rights because: (1) the defendant received a written copy of the <u>Miranda</u> warning, (2) authorities determined that the defendant could read and understand English, (3) the defendant was provided with an opportunity to read the warnings, and (4) authorities specifically read aloud the portion of the <u>Miranda</u> warning advising the defendant of his right to remain silent and his right to an attorney. <u>Id.</u> at 2262. Significantly, the defendant also never actually contended that he did not understand the <u>Miranda</u> warning. <u>Id.</u> The Court next noted that the defendant had decided to answer questions asked by

authorities.  Id. at 2263.  The Court reasoned that if the defendant had wished to invoke his right to remain silent, the defendant should have said nothing.  Id.  Lastly, the Court pointed to the fact that there was no evidence that the defendant had been coerced into making his statements.  Id.  The Court concluded that the totality of the circumstances demonstrated that the defendant had adequately waived his Fifth Amendment rights against self-incrimination.  Id.

As in Berghuis, the totality of the circumstances in the instant case appears to demonstrate that Defendants waived their Fifth Amendment rights against self-incrimination, though it is admittedly a somewhat closer case with respect to certain of the above criteria.  In the instant case, Defendants affirmatively contest that they understood the Miranda warning.  However, the evidence before the Court indicates that Special Agent Knox did, in fact, ask each Defendant if he understood the rights that had just been given to him.  Although the testimony diverges as to the precise nature of Defendants' response—Special Agents Knox and Mordecai recalled only nodding and/or the lack of any indication of not understanding, whereas Mr. Ismail recalls each Defendant verbally saying "Yes" in Somali—the testimony is uniform in suggesting understanding, as opposed to lack thereof, on the part of Defendants.  Ultimately, Defendants were adequately warned of their rights against self-incrimination under the Fifth Amendment in accordance with the requirements of Miranda.  The Miranda rights

were recited to Defendants, through Ismail, the interpreter, in their native language. At no point did Defendants claim that they did not understand the words being recited by Ismail, or that Ismail was not speaking their native language or dialect. Moreover, during the entire interview process, Defendants were awake, alert, drug-free, and engaged.

Of course, whether Defendants actually understood their Fifth Amendment rights against self-incrimination remains a somewhat close question. Defendants argue that their upbringing in a country that has become increasingly lawless in recent decades rendered them incapable of understanding the _Miranda_ rights recited, and, moreover, that the Government has failed to provide evidence of such understanding. It does not appear that applicable Supreme Court precedent, such as the Court's decisions in _Berghuis_ and _Spring_, directly addresses situations in which defendants claim not to comprehend the rights recited to them. Moreover, in _Berghuis_, the Court reiterated that a showing that the _Miranda_ warning was adequately recited and that a defendant thereafter made uncoerced statements, standing alone, is insufficient to demonstrate a valid waiver; instead, the Government must show that the suspect actually understood the rights. _Berghuis_, 130 S. Ct. at 2261.

Nevertheless, it appears from the case law of several Courts of Appeals that the inquiry as to whether a defendant understood the recitation of the Fifth Amendment rights focuses not on the

39

defendant's understanding of the U.S. criminal justice system, the democratic form of government, and/or the concept of individual rights, but rather on whether the defendant could, merely as a linguistic matter, comprehend the words spoken to him. See, e.g., United States v. Labrada-Bustamante, 428 F.3d 1252, 1259 (9th Cir. 2005) (explaining that a Government agent "was not required to explain to [the defendant] what the Miranda rights meant" and that "[t]he fact that [the defendant] might not be familiar with the United States' form of justice is merely one factor to be considered") (citing United States v. Frank, 956 F.2d 872, 877 (9th Cir. 1991)); United States v. Robinson, 404 F.3d 850, 861 (4th Cir. 2005) (finding that the defendant's "below average I.Q. does not make him per se incapable of intelligently waiving his rights"); United States v. Amano, 229 F.3d 801, 805 (9th Cir. 2000) (finding a defendant's waiver of his Miranda rights to have been voluntary in the circumstances of that case, despite his "previous lack of contact with the criminal justice system in the United States, and his lack of contact with the Japanese consulate"); United States v. Rosario-Diaz, 202 F.3d 54, 69 (1st Cir. 2000) (denying a suppression motion made on the grounds that the defendant had a below-average I.Q. and no prior experience with the criminal justice system); United States v. Beale, 921 F.2d 1412, 1435 (11th Cir. 1991) (acknowledging that "[t]here is caselaw that supports the district court's finding that despite [the defendant's] lack of education and inability to speak English, he was capable of

40

knowingly and intelligently waiving his Miranda rights," and collecting decisions of the Fifth, Eleventh, and District of Columbia Circuits, but ultimately distinguishing the case before it from those precedents); United States v. Yunis, 859 F.2d 953, 964-66 (D.C. Cir. 1988) (noting that, due to the lack of applicable precedent, "[i]t is unclear what weight should be given to an alien's unfamiliarity with our legal culture in evaluating the validity of that alien's waiver" but ultimately concluding that, under the circumstances of that case, the defendant's "unfamiliarity with American law did not prevent him from understanding the Miranda rights as they were presented to him") (collecting decisions of the Fifth, Seventh, and D.C. Circuits and the United States District Court for the Southern District of Texas); Dunkins v. Thigpen, 854 F.2d 394, 398-400 (11th Cir. 1988) (affirming denial of habeas petition on, inter alia, the issue of knowing and intelligent waiver of Miranda rights by a defendant who was nineteen years old, almost illiterate, and suffered from mild mental disability); see also Harris v. Riddle, 551 F.2d 936, 938–39 (4th Cir. 1977) (denying habeas relief to a defendant with a below-average I.Q. who waived his Fifth Amendment rights, but then proceeded to make incriminating statements to police based on his own misunderstanding of the applicable law).

Although Defendants have asserted through counsel that they are illiterate, there is no evidence showing them to be of below-average intelligence or to suffer from any mental disabilities.

Accordingly, although Defendants may have a hard time understanding the notion of individual rights such as those guaranteed by the Fifth Amendment, that does not mean that they could not have or did not understand their options upon Special Agent Knox's recitation of the <u>Miranda</u> warnings and the "cleansing statement." Even assuming that Defendants may not have grasped the nature and processes of the United States judicial system—which would admittedly appear to be a rather fair assumption in this case, based on the limited record before the Court—they nevertheless must have understood, from the translated words uttered by Special Agent Knox alone, that they did not have to speak with him, and that they could request counsel. Needless to say, despite current conditions in Somalia, the concept of an attorney is not a foreign one there. <u>See</u> Hr'g Tr. at 377:6—18 (Knox Test.), 440:10—11 (Ismail Test.). Thus, on the basis of the totality of the evidence currently before the Court, the Court finds that Defendants knowingly and intelligently waived their Fifth Amendment rights against self-incrimination.

### iii. The Absence of Coercion and Undue Influence

Defendants lastly argue that the statements from the April 4, 2010 interviews should be suppressed because they were the result of coercion and undue influence. In order to show that statements were involuntary, there must be some evidence of "coercive police activity." <u>Connelly</u>, 479 U.S. at 167. After such a showing, the proper inquiry for determining involuntariness is to assess whether

a defendant's will has been "overborne" or his "capacity for self-determination critically impaired." Pelton, 835 F.2d at 1071. Here, Defendants argue that they were detained in uncomfortable and oppressive conditions, and that they were threatened with being thrown overboard into shark-infested waters if they did not admit guilt. The testimony of the Government's witnesses at the evidentiary hearing uniformly corroborated the Government's assertions in its brief that Defendants were treated safely, humanely, and respectfully throughout the entire duration of their captivity on board the USS Nicholas, and were at no time, including during the April 2, 2010 satellite phone calls and the April 4, 2010 interviews, threatened or mistreated in any way. Hr'g Tr. at 47:23—48:23 (Hutchins Test.), 68:8—22, 73:13—75:11, 171:17—172:14 (Smith Test.), 173:8—19, 174:10—23, 176:21—178:21, 198:12—199:6 (Roblesnavarro Test.), 288:15—21 (Knox Test.), 397:14—23 (Mordecai Test.); cf. id. at 28:14—25 (Hutchins Test.) (Lt. Hutchins acknowledging that Ali offered slight resistance when being brought on board the USS Nicholas, and was taken down to the deck to stop him from resisting), 173:20—174:9 (Smith Test.) (Master at Arms Smith recounting a substantially identical occurrence with Gurewardher); compare id. at 476:18—19 (Hasan Test.) (Hasan testifying that Mr. Ismail said to him, "if you don't tell the truth, hey, you will be thrown in ocean"), with id. at 441:7—15 (Ismail Test.) (Mr. Ismail denying making, translating, or witnessing any such threats). Indeed, Lt. Hutchins testified that

when Defendants were ultimately transferred to the USS Nassau after approximately three weeks on board the USS Nicholas, Gurewardher indicated to Lt. Hutchins (via an interpreter) that he wanted to return to the USS Nicholas because he liked it there. Id. at 75:12-76:20 (Hutchins Test.). The Court has also reviewed the CD, provided by counsel for Ali at the evidentiary hearing, containing video footage of the initial processing of Hasan, Ali, and Dire upon their capture by the crew of the USS Nicholas, as well as of the destruction of the assault boat, which was the only video footage provided to the Court and offered into evidence by any counsel. See Hr'g Ex. D2B. That video footage reflects no mistreatment of, or threats against, those Defendants.

Thus, in the totality of the circumstances, the Court concludes that Defendants' statements during the April 4, 2010 interviews were not the products of undue influence or coercion. For all of the reasons explained above, the Court will **GRANT** Gurewardher's motion to suppress his statements made in connection with the April 2, 2010 telephonic interview, and **DENY** Defendants' motions to suppress the statements they made during the April 4, 2010 interviews.

## B. Hasan's Motion to Dismiss the Indictment Pursuant to the Federal Juvenile Delinquency Act

Hasan moves to dismiss all charges pending against him pursuant to the Federal Juvenile Delinquency Act, 18 U.S.C. §§

44

5031-42 (the "JDA"),[7] on the ground that the Government has failed to show that Hasan was at least 18 years old at the time of the alleged offenses. In response, the Government argues that Hasan's motion should be denied because (1) Hasan told investigators that he was 25 years old, (2) other circumstances demonstrate that Hasan is an adult, and (3) Hasan has failed to produce any credible evidence of his juvenile status. For the reasons discussed below, the Court will **DENY** Hasan's motion in this connection.

Although the Fourth Circuit has previously addressed the nature of, and applicable burden of proof in, proceedings "concerning the potential transfer of a juvenile to adult prosecution in federal court" pursuant to the JDA-United States v. Juvenile Male, 554 F.3d 456, 459-60 & nn. 2-3 (4th Cir. 2009) (citing United States v. Juvenile Male No. 1, 86 F.3d 1314, 1322-23 (4th Cir. 1996))-there do not appear to be any reported Fourth Circuit decisions specifically addressing the burden of proof or admissibility of evidence in resolving a dispute as to a defendant's actual juvenile status under the JDA. Indeed, as the United States Court of Appeals for the Ninth Circuit noted in a recent decision, "[t]here is a paucity of cases addressing the

---

[7] Although Hasan's counsel correctly cites 18 U.S.C. §§ 5031 and 5032 in his memorandum in support of this motion, he occasionally refers to the statute as the "Juvenile Justice Act." See Docket Nos. 77 at 1 & 78 at 1-2. For the sake of clarity, the court notes here that the statute implicated by this motion should not be confused with the Federal Juvenile Justice and Delinquency Prevention Act of 1974, 42 U.S.C. §§ 5601-5792a.

appropriate allocation of the burdens and standard of proof in a hearing to determine juvenile status, and the statute itself is silent on the question." United States v. Juvenile Male, 595 F.3d 885, 896-97 (9th Cir. 2010). Consequently, the Ninth Circuit surveyed "the available cases from other circuits and the district courts," and held that "the government bears the initial burden of proving defendant's age and 'must offer prima facie evidence of defendant's adult status.'" Id. at 897 (quoting United States v. Salgado-Ocampo, 50 F. Supp. 2d 908, 909 (D. Minn. 1999) (internal quotations omitted). The Ninth Circuit also noted that "a previous statement from the juvenile that he is an adult can constitute such prima facie evidence." Juvenile Male, 595 F.3d at 897 (citing United States v. Alvarez-Porras, 643 F.2d 54, 66-67 (2d Cir. 1981)). If the Government adequately presents such prima facie evidence, "[t]he burden then shifts to the defense to 'come forward with evidence of his juvenile status.'" Juvenile Male, 595 F.3d at 897 (quoting Salgado-Ocampo, 50 F. Supp. 2d at 909). If the defendant does so, "the Government then has an opportunity 'to rebut [such evidence] with any additional information'" available. Juvenile Male, 595 F.3d at 897 (relying on Salgado-Ocampo, 50 F. Supp. 2d at 909).

As prima facie evidence of Hasan's juvenile status, the Government relies primarily on a statement made by Hasan on April 4, 2010—three days after being captured—in which he indicated to NCIS agents that he believed himself to be approximately 25 years

46

old. Of course, it should be noted in this connection that statements regarding biographical information, including a defendant's age, are not subject to the requirements of Miranda. See Pennsylvania v. Muniz, 496 U.S. 582 (1990); but see United States v. Doe, 878 F.2d 1546, 1550-52 (1st Cir. 1989) (noting the "booking questions" exception but explaining "that it does not apply where the law enforcement officer, under the guise of asking for background information, seeks to elicit information that may incriminate," such as "questions about citizenship, asked on the high seas, of a person present on a foreign vessel with drugs aboard"); accord United States v. Gaston, 357 F.3d 77, 87-88 (D.C. Cir. 2004) (collecting cases).[8] As previously noted, other courts have found such statements regarding age to be adequate prima facie evidence that the defendant is an adult. See Juvenile Male, 595 F.3d at 897 (finding that a United States Magistrate Judge appropriately treated a defendant's statement that he was 18 years old as prima facie evidence of the defendant's adult status); Alvarez-Porras, 643 F.2d at 66 (finding that the Government had met its burden of proving a defendant's adult status when the defendant

_____

[8] These cases contemplate situations in which the information requested from the suspect would constitute an element of a potentially chargeable criminal offense. A suspect's age, though generally not an offense element in the same sense as, say, a suspect's citizenship, nevertheless has a substantial impact upon the manner in which the Government might proceed against him. However, it is also arguable that there is an "administrative need" for the information—Doe, 878 F.2d at 1551—which would place such a question back within the "booking questions" exception.

represented at the time of arrest that he was 19, but later stated that he was 17, in light of the defendant's lack of credibility and failure to produce other evidence of age); <u>United States v. Aguirre</u>, Crim. Action No. 4:08cr183, 2009 WL 2982797, at *6-7 (E.D. Tex. Sept. 10, 2009) (finding that the Government had offered prima facie evidence that defendant was an adult in the form of initial statements by the defendant which the defendant later contradicted). Accordingly, if this Court were to conclude that Hasan did, in fact, tell the NCIS agents on April 4, 2010 that he was an adult, that statement would constitute adequate prima facie evidence that he was not a minor.[9]

Hasan contends that the Government's evidence does not satisfy the Government's initial burden. In short, Hasan argues that Special Agent Knox's April 4, 2010 notes from his interview with Hasan do not indicate Hasan's actual age. Instead, according to Hasan, the notes indicate that Hasan said he did not know his age, and that Special Agent Knox simply assumed Hasan was 24 or 25 years old.

_____

[9] The Government also relies on other points to support its prima facie case. First, the Government argues that Hasan's role as an apparent leader of the attack indicates that he is not a teenager, which would make him significantly younger than his co-defendants. Second, the Government suggests that Hasan is trying to "game the system" because he thinks the Government will not prosecute a teenager. Third, the Government argues that Hasan looks physically older than a teenager. The aforementioned dearth of case law on this issue makes the relative significance of such points difficult to gauge, except to the extent that the second point would obviously impact the credibility of Hasan's testimony.

This issue was, of course, the subject of detailed testimony at the September 9-10, 2010 evidentiary hearing in this matter. Special Agent Knox testified on direct examination that his notes from his April 4, 2010 interview with Hasan contained the notation: "'unknown age, [Hasan] indicated maybe 25'" years old. Hr'g Tr. at 286:17-25 (Knox Test.); see also Hr'g Ex. D1A (Knox's handwritten notes, containing the words "unknown age - maybe 25"). During cross-examination by Hasan's counsel, Special Agent Knox explained that his notes reflected that Hasan "either said exactly, Maybe I'm 25, I'm 24, 25, 26. . . . I wouldn't have looked at him and said, I think he's 25." Hr'g Tr. at 338:8-11. This point is supported by the fact that, in Special Agent Knox's written report of his interview of Hasan, he indicated that Hasan was of "unknown age," but "believes himself to be 25." Hr'g Ex. D3A (emphasis added). Although Special Agent Knox admitted that he did not recall precisely what number Hasan said, Knox emphasized that "if 25 is written in my notes then the words 25 came out of his mouth as far as I know." Hr'g Tr. at 338:13-14.

When confronted with Special Agent Mordecai's notes reflecting Hasan's age as 24, Special Agent Knox indicated that he had "no idea" where Mordecai got that number. Id. at 338:15-339:6; see also Government Hr'g Ex. 5 (summary and photo array listing Hasan's age as 24); Hr'g Exs. D1B (excerpt from same photo array listing Hasan's age as 24) & D1D (Mordecai's handwritten notes, also listing Hasan's age as 24). When confronted with an email that he

himself authored giving Hasan's age as 26, Special Agent Knox explained that if Hasan "said [he was] between 24 and 26, for the purpose of [Knox's] notes [Knox] would have taken the middle number," 25. Hr'g Tr. at 340:3-5; see also Hr'g Ex. D1C. Knox further indicated that he had "no clue" why he "put 26 in this email and why Mordecai put 24 in his notes." Hr'g Tr. at 340:6-7.

Special Agent Mordecai testified that, to his recollection, none of the Defendants other than Ali claimed to be a teenager during the April 4, 2010 interviews. Hr'g Tr. at 394:6-20 (Mordecai Test.). Special Agent Mordecai further testified that his notes reflected that Hasan gave his age as 24 years old. Id. at 394:25-395:16. Defense counsel's cross-examination of Special Agent Mordecai did not reveal any additional information on this topic. See id. at 402:5-10.

Hasan testified on direct examination by his counsel that he was (at the time of the evidentiary hearing) 18 years old, but further indicated that he does not know his birthday or the year in which he was born. Id. at 474:21-475:1 (Hasan Test.). Hasan also initially denied that Mr. Ismail (the interpreter) ever asked him his age, that he ever told Mr. Ismail his age, or, indeed, that Mr. Ismail ever talked with him, at all. Hr'g Tr. at 475:2-8. On cross-examination, Hasan explained that he had seen Mr. Ismail before, but that Mr. Ismail had not asked him anything. Id. at 475:12-16. Hasan also explicitly denied that the April 4, 2010

interview by Special Agents Knox and Mordecai, with the assistance of Mr. Ismail, ever happened. Id. at 475:17-21.

After a brief re-direct by Hasan's counsel, in which Hasan indicated that he had, in fact, spoken to another Somali while on board the USS Nicholas, the Court sought to clarify whether the Somali to whom Hasan had spoken was, in fact, Mr. Ismail. Id. at 476:12-15. In response to the Court's questioning, Hasan confirmed that Mr. Ismail was, in fact, the person who had spoken to him, and testified that Mr. Ismail had asked him where he came from, and when Hasan replied that he was a fisherman, that Mr. Ismail said that if Hasan did not tell the truth, he would be thrown into the ocean. Id. at 476:16-24. On re-cross, Hasan indicated that he was born in Mogadishu, reiterated that he did not know the year in which he was born, but then explained that other people in the neighborhood where he was born, whose names he could not recall, had told him that he was born 18 years ago. Id. at 478:8-479:8. Hasan further indicated that he did not know of any person or document that could tell the Court how old he was. Id. at 480:3-13.

Although Mr. Ismail, the interpreter, did not testify directly about what age, if any, Hasan gave the Special Agents during the April 4, 2010 interview, his testimony is nevertheless of some relevance in this connection. First, Mr. Ismail, a Somali native, explained, without objection, that most Somalis do not know their exact birth date, but generally know their birth year. Hr'g Tr. at

444:3-23 (Ismail Test.). In considering Hasan's testimony, the Court has, of course, remained cognizant of the relevance of such societal norms. However, Mr. Ismail further testified that in the approximately 100 interviews of suspected pirates in which he had participated as an interpreter, "[a]lmost every interview [he] had, every suspected pirate [he] interviewed claims to be either 17, 18, 16." Id. at 447:4-5. Mr. Ismail recalled in particular one suspect not involved in the instant case who "was bald and . . . had gray hair" but nevertheless insisted that "he was 16," even though, when asked the year he was born, "he said 1975." Hr'g Tr. at 447:9-14. Of course, although Mr. Ismail's experiences in the aggregate are relevant to an extent, they certainly do not lend dispositive weight to the determination that this Court must make with respect to Hasan.

The conflicting nature of the testimony on this issue at the evidentiary hearing requires the Court to weigh the evidence and make credibility determinations to conclude (1) whether the Government has adequately established a prima facie case that Hasan was not a minor at the time of the offenses and (2) whether Hasan's testimony to the contrary adequately rebuts the Government's evidence, and instead establishes that Hasan was, in fact, a minor.

Although, as noted above, the Government has offered several distinct arguments in opposition to Hasan's motion, the Court need look no further than Hasan's own statements to Special Agents Knox and Mordecai. Although the agents' notes and testimony varied

slightly from each other, the variance was effectively explained by Special Agent Knox's testimony, which suggested that Hasan gave them an age range of 24 to 26 years old. The totality of the evidence compels the conclusion that Special Agent Knox's notes simply reflected the middle number in that range, and his subsequent email reflected the higher number, whereas Special Agent Mordecai's notes reflected the lower number. More importantly, nowhere in their notes or testimony is there any suggestion whatsoever that Hasan told them he was under the age of 18. Based on the Court's observation of Special Agents Knox and Mordecai during their testimony, and based on the content of that testimony, the Court finds them both to be credible witnesses, and their testimony to be credible and substantially consistent in all material respects. Consequently, the Court finds that Hasan did, in fact, tell Special Agents Knox and Mordecai during the April 4, 2010 interview that he was (or believed himself to be) between 24 and 26 years old. As noted above, "a previous statement from the juvenile that he is an adult can constitute [the requisite] prima facie evidence"—Juvenile Male, 595 F.3d at 897 (citing Alvarez-Porras, 643 F.2d at 66-67)—and the Court finds that the testimony of Special Agents Knox and Mordecai does precisely that. Accordingly, such prima facie showing having been made, the burden shifts to Hasan to produce credible evidence that he is, in fact, a minor, notwithstanding his statements to the contrary. Juvenile

53

<u>Male</u>, 595 F.3d at 897 (quoting <u>Salgado-Ocampo</u>, 50 F. Supp. 2d at 909).

Hasan's testimony at the evidentiary hearing simply did not meet that burden. The credibility of his testimony was questionable, and he testified that he could produce no corroborating documentary evidence or testimony from others. Although Hasan's lack of knowledge about his own birth date or birth year is rendered less surprising and/or suspect by the testimony of Mr. Ismail discussed above regarding Somali societal norms,[10] Hasan's testimony nevertheless contradicted itself as much as it did the testimony of Special Agents Knox and Mordecai. As detailed above, Hasan first claimed on direct examination that Mr. Ismail "did not talk to" him, and denied that the April 4, 2010 interview with Special Agent Knox even took place. Hr'g Tr. at 475:2-4, 17-21 (Hasan Test.). Although Hasan's counsel later characterized his subsequent re-direct examination of Hasan as "clarifying that [Hasan] was confused by the word 'interpreter'"—<u>id.</u> at 477:13-14—such explanation does not entirely

---

[10] The Government also sought to emphasize the apparent contradiction between Hasan's testimony that he purportedly knows from former neighbors in Mogadishu that he is 18 years old, but that he nevertheless does not know the year in which he was born. <u>See, e.g.</u>, Hr'g Tr. at 477:24-478:2. The Court notes that Hasan's testimony in this connection is not necessarily contradictory; since he does not know his birthday, simply knowing his age in years would not allow him to calculate his birth year with precision. In any case, Hasan's argument is not that he was definitely under the age of 18 when the alleged offenses were committed, but rather that the Government has failed to put forth any evidence that he was 18 or older at the time.

reconcile Hasan's self-contradictory answers. On cross-examination, Hasan was asked, with regard to Mr. Ismail, "Have you ever seen that man before?" Id. at 475:15. Hasan responded, "Meaning before? I saw him, but he did not ask me anything." Id. at 475:16. Mere moments later, upon questioning by the Court, Hasan testified that "the Somali man who was here" (meaning Mr. Ismail), in fact, had "said, hey, where did you come from, and I told him that I was a fisherman." Id. at 476:17-18, 24.

Moreover, although the Court is cognizant that Somalis might not typically record birth dates in the same official, documented manner as do persons in, for example, the United States, the fact nevertheless remains that Hasan was unable to identify any document that would establish his age or name any other person who could testify as to his age. Hasan's testimony thus stands uncorroborated, and flatly contradicted by all of the other testimony and documentary evidence presented to the Court at the evidentiary hearing. Based on the Court's observation of Hasan during his testimony, as well as on the content of that testimony, the Court finds Hasan not to be a credible witness, and accords minimal weight to his self-serving testimony that he is currently only 18 years old. The Court is also mindful that, even if Hasan is correct in asserting that he is 18 years old, since he testified that he does not know his birth date, one must wonder how, a mere five months after his arrest, he knows that he was less than 18 years old at the time of his arrest. Furthermore, Hasan's

testimony that he was told he was 18 years old by people in his Mogadishu neighborhood suggests that such statements were made to him prior to the April 1, 2010 incident at issue, meaning he would have been 18 years old at that time. Thus, in the absence of any other evidence suggesting that Hasan was a minor at the time of the alleged offenses, the court must **DENY** Hasan's motion to dismiss pursuant to the Juvenile Delinquency Act.

### C. Defendants' Joint Motion to Compel Discovery

Defendants next ask that the Court compel the Government to produce to them various materials that they previously requested. Defendants claim that the requested materials go directly to critical issues in the pending case and are essential for their pretrial preparation. It appears that five such categories of materials currently remain at issue: (1) information regarding Mr. Ismail's qualifications, (2) any handwritten notes made by investigators, (3) the NCIS Report of Investigation, (4) an index of relevant sections from all manuals, regulations, and Standard Operating Procedures ("SOP") governing NCIS investigations, and (5) training background information regarding all Government investigators involved in this case. For the reasons discussed below, the Court will **GRANT** Defendants' motion with respect to Mr. Ismail's qualifications, to the extent that they were not already established by his testimony at the evidentiary hearing, and **DENY** Defendants' motion in all other respects.

56

After arraignment, and in accordance with an agreement between Defendants and the Government, counsel for the Defendants made various requests for information and materials from the Government. The items previously requested but, as of the date of Defendants' motion in this connection, not received were as follows:

(1)  A schematic of the weatherdecks of USS Nicholas;

(2)  The qualifications of Mr. Ismail;

(3)  Meteorological, weather, and sea condition data for the area in which USS Nicholas was located on March 31 and April 1, 2010;

(4)  A listing of what lights the USS Nicholas was running/showing on the night of March 31/April 1;

(5)  All video and/or audio recordings of interviews of Dire;

(6)  A complete copy of the NCIS Report of Investigation on this matter, control # 01APR10-EUNA-0129-7GNA, including all attachments and exhibits;

(7)  The navigation and radar "tracks" showing the positioning and movements of the various ships and boats throughout the night of March 31/April 1, 2010

(8)  All photographs and video or audio recordings made concerning the apprehension, search, processing and questioning of Ali and the other Defendants;

(9)  Photographs and a schematic diagram of the locations onboard the USS Nicholas where Ali and the other Defendants were photographed, searched, processed, detained and questioned;

(10) The intelligence data relied upon by the USS Nicholas to pursue, fire upon, and apprehend the Defendants, and destroy their boat, on the night of March 31/April 1, 2010;

(11) The index and relevant sections of all manuals, regulations and SOPs governing investigations and interrogations conducted by NCIS agents, specifically including those sections concerning the questioning and

taking of statements and the recording of such
statements;

(12) The training and schools attended, or courses taken, by
the government investigators involved in this case, in
particular Special Agent Knox, including course syllabi
and the educational and teaching materials used for
training as NCIS agents, on how to conduct
investigations, take statements from witnesses, and seek
to obtain inculpatory statements from suspects;

(13) The Command Information Center (CIC) logs and/or records
or "tracks" showing the positioning and movements of the
various ships and boats throughout the night of March
31/April 1, 2010; and

(14) The handwritten notes of investigators concerning the
interviews of the Defendants.

In response, the Government argues that only three of
Defendants' fourteen (14) requested items remain in dispute. The
Government advises the Court that items 5, 7, and 13 have not been
turned over to Defendants because no such items exist. The
Government further states that items 6, 11, and 12 have not been
turned over to Defendants because they are not discoverable. The
Government also represents that all other requested items that are
discoverable either have already been provided to Defendants as
part of discovery or will be turned over with other materials prior
to trial pursuant to the Jencks Act, 18 U.S.C. § 3500, <u>Brady v.
Maryland</u>, 373 U.S. 83 (1963), or <u>Giglio v. United States</u>, 405 U.S.
150 (1972).

In reply, Defendants have agreed that, since the filing of
Defendants' initial motion, the Government provided additional
materials as described above. However, Defendants maintain that

items 6, 11, and 12 are discoverable. Defendants further argue that the Government's disclosure of items 2 (Mr. Ismail's qualifications) and 14 (handwritten notes of interviewing investigators) was insufficient or incomplete. The Court will consider each such contested item in turn below.

## 1. Item 2 (Mr. Ismail's Qualifications)

Defendants argue that the Government's disclosure of Mr. Ismail's qualifications was insufficient, because it consisted only of an email with a portion of a "scoring memo" contained on a government-operated website. Defendants seek a curriculum vitae, a resume, a listing of any schooling, training or experience, or other items routinely required to establish the qualifications of an expert.

Rule 604 of the Federal Rules of Evidence provides that "[a]n interpreter is subject to the provisions of these rules relating to qualification as an expert and the administration of an oath or affirmation to make a true translation." Fed. R. Evid. 604. Rule 702 provides that witnesses qualify as experts by virtue of their "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Lastly, Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure provides in relevant part:

> At the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rule[] 702 . . . of the Federal Rules of Evidence during its case-in-chief at trial. . . . The summary provided under this subparagraph must describe the witness's opinions, the bases and

> reasons for those opinions, and the witness's qualifications.

Fed. R. Crim. P. 16(a)(1)(G). Accordingly, it appears clear that Defendants are entitled to a written statement of Mr. Ismail's qualifications.

Of course, as a practical matter, many details of Mr. Ismail's personal history, education, training, employment, experience, and qualifications as a Somali interpreter were provided by him during his testimony at the evidentiary hearing. See, e.g., Hr'g Tr. at 410:20-421:1. Nevertheless, it does not appear that the Government has offered a sufficient basis for this Court to conclude that the written discovery provided to Defendants (i.e., the email containing the portion of the "scoring memo") fulfills the requirements of Rule 16(a)(1)(G). Consequently, the Court will **GRANT** this aspect of Defendants' motion.

### 2. Item 14 (Handwritten Interview Notes)

With respect to Defendants' request for the handwritten interview notes of investigators, Defendants concede that they were allowed to view the handwritten notes of Special Agent Knox, but assert that they did not receive a copy of those notes. Defendants further contend that they were not shown or given any notes from other investigators in this case, such as Special Agent Mordecai, who was also present during the interviews of Defendants. Defendants cite numerous decisions from outside of the Fourth Circuit for the proposition that an agent's interview notes may

serve as fertile ground for impeachment of the agent's version of the defendant's post-arrest statement, and are thus discoverable. See Docket No. 151 at 2-4. Despite Defendants' reference to the utility of such notes for impeachment purposes, this issue is not so much a Jencks Act issue as one relating to Rule 16 of the Federal Rules of Criminal Procedure. That Rule provides in relevant parts:

> **(A) Defendant's Oral Statement.** Upon a defendant's request, the government must disclose to the defendant the substance of any relevant oral statement made by the defendant, before or after arrest, in response to interrogation by a person the defendant knew was a government agent if the government intends to use the statement at trial.
>
> **(B) Defendant's Written or Recorded Statement.** Upon a defendant's request, the government must disclose to the defendant, and make available for inspection, copying, or photographing . . .
>
> **(i)** any relevant written or recorded statement by the defendant if:
>
> - the statement is within the government's possession, custody, or control; and
>
> - the attorney for the government knows—or through due diligence could know—that the statement exists; [and]
>
> **(ii)** the portion of any written record containing the substance of any relevant oral statement made before or after arrest if the defendant made the statement in response to interrogation by a person the defendant knew was a government agent . . . .

Fed. R. Crim. P. 16(a)(1)(A)-(B).

On the issue of handwritten notes, Lt. Hutchins testified that he did not take notes during the April 2, 2010 satellite phone

conversations, but that Intelligence Specialist Vellucci did take notes, a point which was corroborated by Vellucci. Hr'g Tr. at 59:21-22 (Hutchins Test.), 117:6-8, 213:6-12 (Vellucci Test.) & 215:1-5. Vellucci testified that he did not retain his handwritten notes, and that he did not take notes of the specific questions asked. However, his typewritten notes were provided to Defendants' counsel. Id. at 230:9-12.

Lt. Hutchins also testified that none of the sailors present for the April 4, 2010 interviews of Defendants took notes, a point which was corroborated by Master at Arms Smith and, to some extent, by Electronics Technician Roblesnavarro. Id. at 118:16-18, 162:5-7, 188:6-7 (Smith Test.), 206:6-14 (Roblesnavarro Test.). The Government specifically represented at the evidentiary hearing that Special Agent Mordecai's handwritten notes of the April 4, 2010 interviews were provided to Defendants' counsel, and both those notes and Special Agent Knox's handwritten notes of those interviews were, in fact, admitted into evidence in the course of the hearing. See Hr'g Tr. at 328:23-7, 395:17-19, 404:17-23. Special Agent Knox also testified that he did not instruct Mr. Ismail to take notes of the April 4, 2010 interviews. Id. at 337:18-20.

On the basis of the foregoing, it appears that the Government has now satisfied its obligations under Rule 16(a)(1) in this connection. Consequently, this aspect of Defendants' motion will therefore be **DENIED AS MOOT**.

### 3. Item 6 (NCIS Report of Investigation)

According to Defendants, the NCIS Report of Investigation (the "NCIS Report") contains investigation summaries, witness statements taken, all records or documents obtained or reviewed during the investigation, and other relevant information, and is thus discoverable pursuant to Rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure. Defendants claim that the NCIS Report should be disclosed to afford them adequate trial preparation. The Government argues in opposition to Defendants' request that the NCIS Report is not discoverable due to Rule 16(a)(2). In reply, Defendants argue that Rule 16(a)(2) does not apply to the disclosure requirements of Rule 16(a)(1)(E).

Rule 16(a)(1)(E) states:

Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:

(i) the item is material to preparing the defense;

(ii) the government intends to use the item in its case-in-chief at trial; or

(iii) the item was obtained from or belongs to the defendant.

Fed. R. Crim. P. 16(a)(1)(E). Rule 16(a)(2) provides that "[e]xcept as Rule 16(a)(1) provides otherwise, this rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by . . . [a] government

63

agent in connection with investigating or prosecuting the case."
Fed. R. Crim. P. 16(a)(1)(E). Although this cross-reference to
Rule 16(a)(1) in Rule 16(a)(2) clearly suggests that _portions_ of
internal government documents that fall into one of Rule 16(a)(1)'s
categories are discoverable notwithstanding the provisions of Rule
16(a)(2), the Fourth Circuit has explained that this rationale does
not consequently render such documents discoverable in their
entirety. See United States v. Lewis, 35 F.3d 148, 150-52 (4th
Cir. 1993) (explaining that the Government properly disclosed the
portions of a government report that were discoverable under Rule
16(a)(1) but affirming, _inter alia_, the district court's refusal to
order the Government to disclose the report in its entirety).

On the basis of the foregoing discussion, it is clear that a
complete copy of the NCIS Report is not discoverable by Defendants
because the document has been made by one or more government agents
in connection with investigating Defendants and prosecuting the
instant case. However, Defendants may properly request those
portions of the NCIS Report that fall within any of the categories
in Rule 16(a)(1).

The Government represents that it has turned over those
portions of the NCIS Report that are currently discoverable, likely
_Brady_ material, and other documents that are material to
Defendants' case, and that it will provide other portions of the
NCIS Report, such as the witness interview reports, as part of pre-
trial disclosure pursuant to the Jencks Act and _Giglio_. It thus

appears that the Government has satisfied its current obligations under Rule 16(a)(1) in this connection, and the Court will **DENY** this aspect of Defendants' motion.

## 4. Items 11 and 12 (Manuals, Regulations and SOPs and Training and School Information for Investigators)

Defendants also seek disclosure of (1) relevant sections from all manuals, regulations, and standard operating procedures ("SOPs") governing investigations and interrogations conducted by NCIS agents, and (2) training and educational information for the government investigators involved in the case. Defendants contend that such information is discoverable under Rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure. Defendants further claim that such information is relevant to the potential suppression of evidence because it appears that NCIS agents did not comply with their governing regulations and procedures. The Government responds by arguing, again, that internal government documents are excluded from discovery under Rule 16(a)(2). The Government further contends that information about whether NCIS agents followed procedures is irrelevant because suppression of evidence depends on whether the agents complied with constitutional requirements, not agency regulations.

The Court quoted the language of Rule 16(a)(1)(E) in substantial part above, and will not quote it again here. The only portion of Rule 16(a)(1)(E) relevant here is subsection (i), which provides disclosure when "the item is material to preparing the

defense." Fed. R. Crim. P. 16(a)(1)(E)(i). "For the defendant to show materiality under this rule, '[t]here must be some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor.'" United States v. Caro, 597 F.3d 608, 621 (4th Cir. 2010) (quoting United States v. Ross, 511 F.2d 757, 763 (5th Cir. 1975) (alteration in original)). As the Government correctly argues, in determining whether a defendant's statements may be admitted at trial, courts look not to applicable agency regulations or procedures, but instead to the Constitution. See United States v. Caceres, 440 U.S. 741, 749-56 (1979) (holding that the failure of an IRS agent to follow IRS electronic surveillance regulations did not require suppression of a tape recording where the relevant regulations were not constitutionally mandated); In re Shain, 978 F.2d 850, 854 (4th Cir. 1992) (finding a U.S. Department of Justice regulation to be "of the kind to be enforced internally by a governmental department, and not by courts through exclusion of evidence.").

As noted above, Defendants argue that the NCIS agents' failure to record the April 4, 2010 interviews was a breach of NCIS procedure, and that such recordings would have been extremely relevant to—indeed, perhaps even largely dispositive of—the issue of suppression. However, even if the failure to record the interviews did, in fact, constitute a breach of NCIS procedure, there simply does not appear to be a constitutional dimension to

that failure that would justify suppression of Defendants' statements during those interviews. In light of that fact, it does not appear that the regulations, manuals, and SOPs governing interrogations and investigations, or the training and educational backgrounds of the investigating officers, would "enable[] [Defendants] significantly to alter the quantum of proof in [their] favor.'" Caro, 597 F.3d at 621 (quoting Ross, 511 F.2d at 763). Consequently, the Court will **DENY** this aspect of Defendants' motion.

## D. Ali, Hasan, and Dire's Motion to Dismiss Counts Nine, Ten, and Eleven of the Superseding Indictment

Ali, Hasan, and Dire move to dismiss Counts Nine, Ten, and Eleven of the Superseding Indictment.[11]  These Counts allege that these Defendants used and carried, and conspired to use and carry, a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924, subsections (c) and (o).  These Defendants contend that the Court has no jurisdiction over Counts Nine, Ten, and Eleven because 18 U.S.C. § 924 does not apply within the special maritime jurisdiction of the United States or on the high seas.

"[T]he criminal jurisdiction of the United States is in general based on the territorial principle, and criminal statutes of the United States are not by implication given an

---

[11] These Counts correspond to Counts Four, Five, and Ten of the original Indictment.

extraterritorial effect." <u>United States v. Flores</u>, 289 U.S. 137, 155 (1933). As a result, "[i]t is a longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" <u>EEOC v. Arabian Am. Oil Co.</u>, 499 U.S. 244, 248 (1991) (quoting <u>Foley Bros. v. Filardo</u>, 336 U.S. 281, 285 (1949)). Accordingly, in assessing whether a criminal statute applies extraterritorially, a court must determine "whether 'language in the [relevant Act] gives any indication of a congressional purpose to extend its coverage beyond places over which the United States has sovereignty or has some measure of legislative control.'" <u>Arabian Am. Oil Co.</u>, 499 U.S. at 248 (quoting <u>Foley Bros.</u>, 336 U.S. at 285) (alteration in original). Therefore, legislation is presumed to be "'primarily concerned with domestic conditions'" unless Congress has expressed an affirmative intention otherwise. <u>Arabian Am. Oil Co.</u>, 499 U.S. at 248 (quoting <u>Foley Bros.</u>, 336 U.S. at 285).

Defendants Ali, Hasan, and Dire contend that nowhere has Congress been more precise in its designation of extraterritorial application of criminal law than with regard to crimes occurring on the high seas. Such criminal statutes typically expressly provide for their application in the "special maritime and territorial jurisdiction of the United States," which is defined to include the high seas. <u>See</u> 18 U.S.C. § 7. No such language is included in 18 U.S.C. § 924(c) or (o), the statute underlying Counts Nine, Ten,

and Eleven of the Superseding Indictment.  In short, Ali, Hasan, and Dire argue that "[w]hen it desires to do so, Congress knows how to place the high seas within the jurisdictional reach of a statute"—Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 440 (1989)—and that Congress simply has not done so with respect to 18 U.S.C. § 924.

On the other hand, "[a] federal statute is not necessarily limited to crimes committed within the territorial jurisdiction of the United States because it lacks an express provision that it should be applied extraterritorially." United States v. Birch, 470 F.2d 808, 811 (4th Cir. 1972) (citing United States v. Bowman, 260 U.S. 94, 97 (1922)). "Where the power of the Congress is clear, and the language of exercise is broad," there is "no duty to construe a [criminal] statute narrowly" on the issue of extraterritoriality.  United States v. Erdos, 474 F.2d 157, 159 (4th Cir. 1973).

With this canon of construction in mind, the Court looks to the language of the statute in question.  Title 18, Section 924(c)(1)(A) provides in relevant part:

> any person who, during and in relation to any crime of violence . . . (including a crime of violence . . . that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence . . . [be sentenced to a term of imprisonment].

18 U.S.C. § 924(c)(1)(A). A "crime of violence" is further defined as a felony that:

> **(A)** has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
> **(B)** that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3). Lastly, § 924(o) provides that:

> A person who conspires to commit an offense under subsection (c) shall be imprisoned for not more than 20 years, fined under this title, or both; and if the firearm is a machinegun or destructive device, or is equipped with a firearm silencer or muffler, shall be imprisoned for any term of years or life.

18 U.S.C. 924(o).

Whether 18 U.S.C. §§ 924(c) and (o) have extraterritorial application is a question of first impression in the Fourth Circuit. To date, the Court is aware of three other federal courts that have considered the question of whether § 924(c) applies extraterritorially, and each has found that it does. See United States v. Belfast, 611 F.3d 783, 813-16 (11th Cir. 2010) (holding that 18 U.S.C. § 924(c) applied extraterritorially in an overseas torture case); United States v. Reumayr, 530 F. Supp. 2d 1210, 1219 (D.N.M. 2008) (holding that 18 U.S.C. § 924(c) applied extraterritorially to a Canadian citizen involved in a bomb plot); United States v. Bin Laden, 92 F. Supp. 2d 189, 201 (S.D.N.Y. 2000) (holding that 18 U.S.C. § 924(c) applied to bombings of United States Embassies in East Africa).

The Government's argument in support of the extraterritorial application of 18 U.S.C. §§ 924(c) and (o) in this case largely tracks the courts' analyses in the decisions cited immediately above. First, the Government argues that, by using the phrases "any person" and "any crime of violence or drug trafficking crime," Congress wrote 18 U.S.C. § 924(c) in the broadest possible way. The Government argues that § 924(o) is similarly written to apply to "[a] person," without qualification. As such, the Government contends, 18 U.S.C. §§ 924(c) and (o) apply to all persons and all underlying federal crimes, including federal crimes committed on the high seas.

Second, the Government echoes the aforementioned decisions by emphasizing that 18 U.S.C. § 924(c) is an ancillary statute that requires an underlying federal crime. Accordingly, the Government contends, Congress did not need to include separate jurisdictional language in 18 U.S.C. § 924, because the statutory language of the underlying federal crimes alleged in the Superseding Indictment would supply the extent of jurisdiction intended by Congress.

The Court finds the Government's arguments on this issue to be persuasive. As the United States Court of Appeals for the Eleventh Circuit explained in Belfast, "[o]n its face, there is simply no limitation in the language of [18 U.S.C. § 924(c)] concerning its application to crimes outside of the United States." Belfast, 611 F.3d at 814. The Eleventh Circuit continued, stating, "[t]he statute notably does not apply to any crime of violence 'committed

in the United States,' but instead applies quite broadly to any crime of violence that 'may be prosecuted in a court of the United States.'" Id. The Belfast court further found, relying on the United States District Court for the District of New Mexico's decision in Reumayr, that "it is generally the rule that 'a statute ancillary to a substantive offense statute is presumed to have extraterritorial [effect] if the underlying substantive offense statute is determined to have extraterritorial [effect].'" Belfast, 611 F.3d at 814 (quoting Reumayr, 530 F. Supp. 2d at 1219) (alterations in original); see also United States v. Mohammad-Omar, 323 F. App'x 259, 261 n.2 (4th Cir. Apr. 27, 2009) (unpublished) ("The statutory bases for charging conspiracy may be applied extraterritorially where the underlying substantive statutes reach extraterritorial offenses."). As ancillary statutes for which the underlying federal offenses in this case dictate jurisdiction over acts committed on the high seas, 18 U.S.C. §§ 924(c) and (o) also apply extraterritorially in this case. Consequently, the Court will **DENY** Ali, Hasan, and Dire's motions to dismiss Counts Nine, Ten, and Eleven of the Superseding Indictment.

### E. Ali and Hasan's Motions to Dismiss Counts Seven and Eight of the Superseding Indictment

Ali and Hasan contend that Counts Seven and Eight of the Superseding Indictment, which charge Defendants with committing assaults on federal officers, in violation of 18 U.S.C. § 111 subsections (a)(1) and (b), must be dismissed because they do not

72

apply extraterritorially. As with their motions to dismiss Counts Nine, Ten, and Eleven of the Superseding Indictment, Ali and Hasan argue that the text of 18 U.S.C. § 111 does not demonstrate Congressional intent for the statute to apply to offenses allegedly committed on the high seas. In response, the Government raises essentially the same arguments discussed above with respect to the issue of extraterritorial application of federal statutes.

Section 111 imposes criminal liability upon anyone who "forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in [18 U.S.C. § 1114] while engaged in or on account of the performance of official duties." 18 U.S.C. § 111(a)(1). Section 1114 defines the persons protected by 18 U.S.C. § 111 as "any officer or employee of the United States or of any agency in any branch of the United States Government (including any member of the uniformed services)." 18 U.S.C. § 1114.

As with 18 U.S.C. §§ 924(c) and (o), discussed above, 18 U.S.C. § 111 applies broadly to "any person designated in" 18 U.S.C. § 1114, which, in turn, defines such persons as "any officer or employee of the United States." 18 U.S.C. §§ 111 & 1114. It appears that the only court to have squarely addressed the question of 18 U.S.C. § 111's extraterritorial reach to date is the Eleventh Circuit in United States v. Benitez, 741 F.2d 1312 (11th Cir. 1984). In that case, the defendant was prosecuted for, among other things, assaulting DEA agents while in Colombia, in violation of 18

U.S.C. § 111. As in the instant case, the defendant there challenged the extraterritorial application of the criminal statute. _Id._ at 1316-17. The Eleventh Circuit rejected the defendant's argument, instead observing that "there is every indication in this case that Congress intended the statutes in question to have extraterritorial application." _Id._ at 1317. The Eleventh Circuit held "that assault and attempted murder of DEA agents is exactly the type of crime that Congress must have intended to apply extraterritorially." _Id._

It is also of some significance that other courts have found 18 U.S.C. § 1114—which, as noted above, is explicitly cross-referenced in 18 U.S.C. § 111 for its definition of protected persons—to have extraterritorial application. Section 1114 imposes criminal liability upon anyone who:

> kills or attempts to kill any officer or employee of the United States or of any agency in any branch of the United States Government (including any member of the uniformed services) while such officer or employee is engaged in or on account of the performance of official duties, or any person assisting such an officer or employee in the performance of such duties or on account of that assistance.

18 U.S.C. § 1114. In <u>United States v. Bin Laden</u>, the United States District Court for the Southern District of New York found that 18 U.S.C. § 1114 applied extraterritorially. 92 F. Supp. 2d. 189, 202-03. In analyzing that statute, the court there observed:

> Given (i) that this provision is explicitly intended to protect vital United States interest, (ii) that a significant number of United States officers and employees perform their official duties in places outside

the United States, and (iii) that, accordingly, foreign
nationals are in at least as good a position as are
United States nationals to kill or attempt to kill United
States officers and employees, we concur with the
Eleventh Circuit's holding [in Benitez] that the offense
described by Section 1114 is "exactly the type of crime
that Congress must have intended to apply
extraterritorially"—irrespective of the nationality of
the offender.

Bin Laden, 92 F. Supp. 2d at 202 (quoting Benitez, 741 F.2d at
1317); see also United States v. Al Kassar, 582 F. Supp. 2d 488,
497 (S.D.N.Y. 2008) (finding that 18 U.S.C. § 1114 warrants
extraterritorial application because "[i]t is beyond question that
the United States Government has a strong and legitimate interest
in protecting its officers and employees performing official duties
abroad.").

Notwithstanding the analysis in the above cases, perhaps the
strongest argument for extraterritorial application is the text of
the statute itself. The conclusion that 18 U.S.C. § 111 applies
extraterritorially is reflected in its plain language, which
extends to assaults against "any member of the uniformed services."
18 U.S.C. § 111. The use of the term "any member" reflects a
choice of the broadest available term. Furthermore, because it is
obvious that the members of the uniformed services often perform
their official duties abroad, Congress must have intended 18 U.S.C.
§ 111 to have extraterritorial reach. See United States v. Birch,
470 F.2d 808, 811 (4th Cir. 1972) (inferring "that Congress
intended to protect the government against forgery of [military

75

passes] wherever the armed forces of the United States were stationed").

For the foregoing reasons, this Court concludes that 18 U.S.C. § 111 has extraterritorial application. Consequently, the Court will **DENY** Ali and Hasan's motion to dismiss Counts Seven and Eight of the Superseding Indictment.

## F. Ali and Hasan's Motions to Dismiss Counts Thirteen and Fourteen of the Superseding Indictment

Ali and Hasan contend that Counts Thirteen and Fourteen of the Superseding Indictment, which charge Defendants with carrying and conspiring to carry an explosive during the commission of a felony, in violation of 18 U.S.C. § 844 subsections (h)(2) and (m), must be dismissed because the statutes do not apply extraterritorially. As with their motions to dismiss Counts Seven, Eight, Nine, Ten, and Eleven, Ali and Hasan argue that the text of 18 U.S.C. § 844 does not demonstrate Congressional intent for the statute to apply to offenses allegedly committed on the high seas. In response, the Government reasserts essentially the same arguments raised in opposition to the motions discussed above regarding extraterritorial application.

Section 844(h) imposes criminal liability upon anyone who:

**(1)** uses fire or an explosive to commit any felony which may be prosecuted in a court of the United States, or

**(2)** carries an explosive during the commission of any felony which may be prosecuted in a court of the United States,

76

> including a felony which provides for an enhanced
> punishment if committed by the use of a deadly or
> dangerous weapon or device.

18 U.S.C. § 844(h). Defendants emphasize the absence of any language in the statute providing for application to conduct occurring on the high seas. For substantially the same reasons articulated by the Government in response to the motions to dismiss discussed above, the Government argues that 18 U.S.C. § 844(h) is broadly written as an ancillary provision for which there is extraterritorial jurisdiction so long as the statutes for the underlying offenses have extraterritorial application.

In United States v. Bin Laden, a case involving the bombing of United States embassies in East Africa, the court employed substantially the same reasoning urged by the Government in this case, concluding that 18 U.S.C. § 844(h) had extraterritorial application. See 92 F. Supp. 2d. 198-99. The court explained that because the statute for the underlying offense in that case—18 U.S.C. § 2232(b)—applied extraterritorially, so did 18 U.S.C. § 844(h), the ancillary provision. Id.; see also Reumayr, 530 F. Supp. 2d at 1217-19 (holding that Congress intended a similar subsection in the same statute, 18 U.S.C. § 844(i), to apply extraterritorially). Similarly, in United States v. Lindh, defendant John Walker Lindh pled guilty in this District to an offense in violation of 18 U.S.C. § 844(h) that was committed entirely within Afghanistan. See United States v. Lindh, 227 F. Supp. 2d 565, 569-70 (E.D. Va. 2002). The court observed that "by

carrying an explosive during the commission of a felony which may be prosecuted in the United States, defendant committed a felony violation of 18 U.S.C. § 844(h)(2)," implicitly concluding that the statute had extraterritorial applicability.  Id. at 570.

For the foregoing reasons, as well as those provided in connection with the other motions to dismiss discussed above, this Court finds that, in the context of this case, 18 U.S.C. § 844 has extraterritorial application.  Consequently, the Court will **DENY** Ali and Hasan's motions to dismiss Counts Thirteen and Fourteen of the Superseding Indictment.

## G.  Ali and Hasan's Motions to Dismiss the Superseding Indictment Pursuant to Rule 48(b) and the Speedy Trial Act

Ali and Hasan also move the Court to dismiss the Superseding Indictment pursuant to Rule 48(b) of the Federal Rules of Criminal Procedure and the Speedy Trial Act, 18 U.S.C. § 3161-74, arguing that the Superseding Indictment violates Defendants' right to a speedy trial.  In short, Ali and Hasan argue that the Government has engaged in deliberate, unnecessary, and oppressive delay in prosecuting this case.  Defendants further contend that the Government cannot allege new charges in a Superseding Indictment based on the same set of facts and same defendants that were included in the original Indictment.  The Government argues in response that Ali and Hasan's claims in this connection have no basis in either statute or the Federal Rules of Criminal Procedure.

Rule 48(b) provides that "[t]he court may dismiss an indictment, information, or complaint if unnecessary delay occurs in: (1) presenting a charge to a grand jury; (2) filing an information against a defendant; or (3) bringing a defendant to trial." Fed. R. Crim. P. 48(b). "This provision not only allows a court to dismiss an indictment on constitutional grounds, but it also restates the court's inherent power to dismiss an indictment for lack of prosecution where the delay is not of a constitutional magnitude." United States v. Goodson, 204 F.3d 508, 513 (4th Cir. 2000) (internal citation omitted). Moreover, as the United States Court of Appeals for the Tenth Circuit observed in a recent decision, "Rule 48(b)(1) is consistent with the well established rule that, absent prejudice to the defendant, a superseding indictment may be filed at any time before trial, and is appropriately deferential to the core executive constitutional function of designing and pursuing prosecutions." United States v. Begay, 602 F.3d 1150, 1154 (10th Cir. 2010) (internal quotations and citations omitted). The Tenth Circuit further explained that dismissal pursuant to Rule 48(b) is not warranted merely by a court's disagreement with the Government's charging decisions, even ones calculated to have tactical effect, but is instead reserved primarily for cases in which a defendant has shown prosecutorial vindictiveness or demonstrated prejudice. Id. at 1154-56.

In the instant case, Ali and Hasan have failed to show any vindictiveness on the part of the Government or any prejudice

79

resulting from the filing of the Superseding Indictment. At best, they suggest that the Government, in seeking to declare the case complex, misrepresented how long it would take for the USS Nicholas to return to Norfolk, Virginia and the extent of the classified information involved. Defendants claim that the Government was, in actuality, stalling in order to file the Superseding Indictment. However, as evidenced by this Court's filing of the unclassified Protective Order in this case, the Government has, in fact, been required to review, and submit to this Court, pieces of classified information for determination as to whether or not they are discoverable. Admittedly, the Government may have underestimated the time it would take for the USS Nicholas to return to Norfolk, but it is also possible that the Assistant United States Attorneys prosecuting this case simply were not aware of the date of the USS Nicholas's impending return. In any event, such evidence hardly rises to a level of vindictiveness sufficient to warrant dismissal of the Superseding Indictment pursuant to Rule 48(b).

Turning next to the argument that dismissal is nevertheless authorized by the Speedy Trial Act, Ali and Hasan rely primarily on United States v. Van Brandy, 563 F. Supp. 438 (S.D. Cal. 1983). In Van Brandy, the court dismissed additional counts brought in a superseding indictment returned on the Friday before trial was scheduled to begin because the government provided no valid explanation for its delay in charging the additional offenses. Id. at 440-41. In the course of distinguishing several decisions of

various United States Courts of Appeals to the contrary,[12] the court in Van Brandy stated: "It appears to this court that when, as here, information relating to the additional counts is known well in advance of the date of the superseding indictment, the government must come forward with valid reasons as to why it delayed in seeking the additional counts against the defendants." Id. at 440. The Van Brandy court's primary concern appeared to be that the last-minute filing of additional allegations conflicted with the Speedy Trial Act's function of ensuring that defendants are on notice of all of the charges against them and to prevent double jeopardy. Id. Ali and Hasan further point to the Fourth Circuit's unpublished decision in United States v. Ables, 801 F.2d 395, 1986 WL 17615 (4th Cir. 1986) (unpublished per curiam table decision), claiming that it manifests the Fourth Circuit's adoption of the Van Brandy court's analysis. Purportedly on the basis of those decisions, Hasan and Ali argue that because the Superseding Indictment adds new charges based on the same set of facts known to the Government at the time of the filing of the original Indictment, the Superseding Indictment violates the Speedy Trial Act and must be dismissed.

The Government argues in response that the Speedy Trial Act is simply inapposite here. As the Government notes, Ali and Hasan do

---

[12] To wit, United States v. Rabb, 680 F.2d 294 (3d Cir. 1982), United States v. Budzyna, 666 F.2d 666 (1st Cir. 1981), and United States v. Wilks, 629 F.2d 669 (10th Cir. 1980), all of which are discussed below.

not cite any particular provision of the Speedy Trial Act that would authorize such a dismissal, and the portion of that statute providing for dismissal as a remedy for violation of 18 U.S.C. § 3161's timing requirements—18 U.S.C. § 3162(a)(1)—relates by its very terms only to cases initiated by the filing of a criminal complaint, which was not done in this case. See Docket No. 130 at 4-6; 18 U.S.C. §§ 3161(b)-(c) & 3162(a)(1).

Ali and Hasan's reliance on Van Brandy is misplaced. See, e.g., United States v. Lewis, 156 F. Supp. 2d 1280, 1285 (M.D. Fla. 2001) (criticizing Van Brandy as being unsupported by precedent or authority and concluding that, in any case, Van Brandy does "not stand for the proposition that a superseding indictment, including charges related to the charge in the criminal complaint, cannot issue more than thirty days after an arrest or the issuance of a summons"). Although the Fourth Circuit appears not yet to have ruled definitively on this point in the context presented by this case in a published decision, "[s]everal circuits have . . . held that superseding indictments filed longer than thirty days after an arrest which add charges to those contained in the original indictment do not violate the Speedy Trial Act." United States v. Hemmings, 258 F.3d 587, 592 (7th Cir. 2001) (collecting decisions of the United States Courts of Appeals for the Fifth, Ninth, and Eleventh Circuits); accord United States v. Walker, 545 F.3d 1081, 1086 (D.C. Cir. 2008) ("A superseding indictment filed more than thirty days after arrest . . . does not violate [18 U.S.C.] section

3161(b) so long as the original indictment was filed within the required thirty-day time frame."); 3B Charles Alan Wright et al., Federal Practice and Procedure § 833 & n.21 (3d ed. 2004) (noting that the Speedy Trial "Act does not specify its application to the filing of a superseding indictment with additional charges more than thirty days after arrest, but most courts find that the original indictment tolls the thirty-day time period and allow the additional charges"); see also United States v. Leftenant, 341 F.3d 338, 343 (4th Cir. 2003) (noting that the Speedy Trial Act "does not limit the Government's ability to charge a defendant with offenses unrelated to the charge underlying his arrest," which "'can be brought at any time'") (quoting United States v. Heldt, 745 F.2d 1275, 1279 n.9 (9th Cir. 1984)); United States v. Rabb, 680 F.2d 294, 295-97 (3d Cir. 1982) (holding that Congress did not intend 18 U.S.C. § 3161(b)'s "bar to apply to superseding indictments made necessary by" the erroneous filing of an original indictment returned by a grand jury whose term had already expired); United States v. Budzyna, 666 F.2d 666, 669-70 (1st Cir. 1981) (holding that the sanctions provided by 18 U.S.C. 3162(a) for violations of 18 U.S.C. § 3161 subsections (b) and (c) "do not reach" a case that "involves both an original and a superseding indictment," because Congress did not intend "the date of a superseding indictment, constituting a mere amendment of the original, to take priority over the original for purposes of determining whether or not the sanction provisions apply to the

ongoing case"); United States v. Wilks, 629 F.2d 669, 672-73 (10th Cir. 1980) ("There is nothing in either the [Speedy Trial Act] or the cases construing it to suggest that a superseding indictment must be filed within the [then-applicable] 45-day period allowed for the original indictment."). Although the Ninth Circuit has rejected the broad "proposition that superseding indictments do not fall under the Speedy Trial Act" in favor of a more nuanced approach—Heldt, 745 F.2d at 1279 n.9 (characterizing the Government's reading of an earlier Ninth Circuit decision, United States v. McCown, 711 F.2d 1441 (9th Cir. 1982), to that effect as being "overbroad and improper")—that court nevertheless acknowledged in Heldt with respect to 18 U.S.C. § 3162(a)(1) that "[t]he legislative history of the [Speedy Trial] Act illustrates that Congress considered and rejected language which would restrict reprosecution of conduct 'arising from the same criminal episode' or offenses which were 'known or reasonably should have been known.'" 745 F.2d at 1279 (quoting United States v. Pollock, 726 F.2d 1456, 1463 (9th Cir. 1984)).

Even if the Fourth Circuit's unpublished decision in Ables could fairly be read to adopt the rationale of the Van Brandy court—which is debatable—it does not constitute precedent that is binding upon this Court and, more importantly, does not actually provide support for the position urged by Ali and Hasan. In Ables, the Fourth Circuit admittedly discussed, but ultimately distinguished, Van Brandy. In affirming a district court's denial

of a defendant's motion to dismiss for claimed violations of the
Speedy Trial Act, the Fourth Circuit explained that in Ables,
"unlike in Van Brandy[,] the superseding indictment did not add any
charges and only made minor changes in the original indictment by
expanding the dates of the alleged conspiracy and including some
new overt acts in the allegations." 1986 WL 17615 at *2. In that
context, the Fourth Circuit held, "the authorities indicate that
the Speedy Trial Act allows the government to rely on a superseding
indictment where the government procured the original indictment in
a timely fashion." Id.

        Even if this Court were to agree with Defendants that Van
Brandy and Ables authorize dismissal of the Superseding Indictment,
this case would be factually distinguishable from Van Brandy. In
this case, the arrest warrants for all Defendants were issued on
April 20, 2010, the same date that the original indictment was
filed in this case.[13] Compare Docket Nos. 4-8, with Docket No. 1.
The Superseding Indictment was filed on July 7, 2010, approximately
two-and-a-half months later. More importantly for purposes of
comparison with Van Brandy, the Superseding Indictment was not
filed on the eve of trial, but instead approximately two months
before September 8, 2010—the date on which trial in this case was,
as of that time, scheduled to commence. Accordingly, Ali and Hasan

---

[13] Defendants were indicted 19 days after they were initially
captured by the USS Nicholas on the high seas between Somalia and
the Seychelles.

cannot show any prejudice with respect to the adequacy of time to prepare for trial arising from the filing of the Superseding Indictment. See Hemmings, 258 F.3d at 592-93 (distinguishing Van Brandy and finding that the Government did not violate the Speedy Trial Act by filing a superseding indictment more than forty days before trial); United States v. Mosquera, 95 F.3d 1012, 1013 (11th Cir. 1996) (distinguishing Van Brandy and finding that the Government did not violate the Speedy Trial Act by filing a superseding indictment almost two months before retrial); see also Leftenant, 341 F.3d at 343 (citing Mosquera, 95 F.3d at 1015). Thus, it does not appear that the filing of the Superseding Indictment in any way violated the provisions of the Speedy Trial Act to the detriment of Defendants.

Moreover, the instant case differs from Van Brandy in that the Government has offered here a justification for filing the Superseding Indictment charging additional counts. The Government represents that attorneys from the United States Attorney's Office were first able to interview witnesses from the USS Nicholas in person on June 11, 2010. According to the Government, those interviews deepened their understanding of the testimonial evidence, and informed some of the charging decisions reflected in the Superseding Indictment. The Government further argues that the filing of the Superseding Indictment is also justified in light of the complexities inherent in this novel case, which involves

multiple Government agencies, multiple defendants, and the assembly and review of a large volume of military records and images.

In light of this explanation, and perhaps more importantly, because the Superseding Indictment was filed approximately two months prior to the then-scheduled September 8, 2010 trial date, dismissal of the Superseding Indictment would be a drastic and unwarranted remedy. For the foregoing reasons, the Court will therefore **DENY** Ali and Hasan's motions to dismiss the Superseding Indictment pursuant to Rule 48(b) and the Speedy Trial Act.

### H. Ali and Hasan's Motion for Change of Venue

Ali and Hasan further move the Court to grant a change of venue. Defendants argue that their fundamental right to a fair and impartial jury would be violated by holding the trial in the Eastern District of Virginia because: (1) the jury venire is biased against the Defendants and (2) the jury venire would not provide Defendants with a jury of their peers. The Government opposes Ali and Hasan's motion, arguing that there is no evidence of pervasive community prejudice that might justify a change of venue.

Ali and Hasan argue that the military and maritime presence, combined with prejudicial news coverage, has irreparably poisoned the jury venire in the Eastern District of Virginia. Ali and Hasan contend that this District is the home to the world's largest naval base, and also home to an extensive civilian maritime shipping industry. Ali and Hasan assert that the jury venire is therefore

87

very likely to be prejudiced against them. Moreover, they claim that the press coverage has portrayed Defendants, and the circumstances leading to their capture, unfavorably. Together, according to Ali and Hasan, these circumstances threaten the fundamental fairness of the trial.

"The Sixth Amendment secures to criminal defendants the right to trial by an impartial jury." Skilling v. United States, 130 S. Ct. 2896, 2912-13 (2010). Accordingly, Federal Rule of Criminal Procedure 21(a) provides that "[u]pon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Fed. R. Crim. P. 21(a). The Fourth Circuit has explained that motions for a change of venue are governed by a two-step inquiry. United States v. Bakker, 925 F.2d 728, 732 (4th Cir. 1991).

First, "a trial court must address whether the publicity is so inherently prejudicial that trial proceedings must be presumed to be tainted." Id. In such a case, "a motion for a change of venue should be granted before jury selection begins." Id. However, "[o]nly in extreme circumstances may prejudice to a defendant's right to a fair trial be presumed from the existence of pretrial publicity itself." Wells v. Murray, 831 F.2d 468, 472 (4th Cir. 1987). "Sheer volume of publicity alone does not deny a defendant a fair trial." Bakker, 925 F.2d at 732. Instead, such prejudice

results primarily from inflammatory or emotional publicity, which must be distinguished from factual or unemotional reports. See id. (affirming the district court's conclusion that "vast majority of the evidence reflected unemotional, factual reports of legal proceedings with no prejudicial impact"). Moreover, the recency of any alleged prejudicial publicity is also important, because the likelihood of any impact is lessened with the passage of time. Id.

If no inherent prejudice can be demonstrated prior to jury selection, "a trial court customarily should take the second step of conducting a voir dire of prospective jurors to determine if actual prejudice exists." Id. A change of venue is warranted "[o]nly where voir dire reveals that an impartial jury cannot be impanelled." Id. The voir dire process allows the court to inquire about each juror's personal opinions about a case and the impact of any past or future media attention. Id. at 733. "[I]t is not required . . . that jurors be totally ignorant of the facts and issues involved . . . . It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." Id. at 734 (quoting Irvin v. Dowd, 366 U.S. 717, 722-23 (1961)).

Ali and Hasan have failed to present any evidence reaching the high threshold for showing inherent prejudice in the jury venire. There is no indication that any media reports about Defendants have been sufficiently emotional or inflammatory to justify an inference that they have imbued the community with such hatred towards

Defendants as to make any trial unfair. Similarly, there is simply no indication that this Court would be unable to impanel an impartial jury from the approximately 1.3 million residents of the Norfolk Division of the Eastern District of Virginia merely due to the large naval presence within the Division. Although this case has been the subject of some media attention, it simply does not present any extreme circumstances that would justify a change of venue. Defendants may, of course, request that the Court revisit this issue if, during the juror <u>voir dire</u> process, it appears to them that a fair and impartial jury cannot be impaneled.

In addition, it should be noted that the Supreme Court recently addressed the issue of whether a defendant's constitutional right to an impartial jury had been violated in the <u>Skilling</u> case.[14]    There, the Supreme Court emphasized several factors, three of which are applicable here, in deciding if a jury venire could not be impartial:  (1) the "size and characteristics of the community in which the crime occurred" (or, in this case, where the case is to be tried); (2) whether news stories contained "confession[s] or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut

---

[14]  Here, the Court is not faced with a constitutional challenge, as trial has not yet commenced, let alone concluded.

from sight;" and (3) the time between the commission of a widely reported crime and the trial.[15]  Skilling, 130 S. Ct. at 2915-16.

Here again, however, Ali and Hasan have failed to present any evidence to reach the high threshold for finding any inherent prejudice in the jury pool of this Division.  First, as noted above, the Norfolk Division of the Eastern District of Virginia is home to over 1.3 million residents from a variety of ethnic backgrounds.  Such a high, and highly diverse, population appears to this Court to be sufficient to ensure that Defendants will have the possibility of obtaining an impartial jury.  Second, although the Court is aware that media coverage has included mentions of alleged confessions by Defendants (Gurewardher, in particular), the Court also notes that the very same media coverage has also noted Defendants' positions that such confessions were coerced and elicited in violation of their Fifth Amendment rights pursuant to Miranda.[16]  The Court is unaware of any blatantly prejudicial material in other media coverage that might so shock or inflame the

---

[15] The Court also considered the jury's verdict to be of "prime significance" to the extent that it might undermine a finding of juror bias or prejudice.  Skilling, 130 S. Ct. at 2916.  In Skilling, the jury had acquitted the defendant on nine other counts, belying the suggestion that their convictions were motivated by prejudice against the defendant.  Id.  Here, of course, trial has not yet even commenced.

[16] See, e.g., http://hamptonroads.com/2010/07/pirate-suspect-says-navy-threatened-throw-him-sharks  &  http://hamptonroads.com/2010/09/suspected-pirates-treatment-met-rules-sailors-say-0 (last visited October 25, 2010); see also Hr'g Ex. D2E (collection of news articles regarding the instant case).

91

residents of this Division such that they could not be expected to disregard such material. Third, at the time trial commences, nearly seven months will have passed since Defendants were first brought to Norfolk.

Admittedly, the volume of local media coverage has been compounded by the fact that two cases involving suspected Somali pirates have been proceeding in parallel in this Court (this case and United States v. Said, 2:10cr57 (E.D. Va.), currently pending before United States District Judge Raymond A. Jackson. Nevertheless, there is nothing to indicate that media coverage of the Said case will directly prejudice the Defendants in this case. Indeed, the trial in that case has been stayed while a pretrial ruling is on appeal. For all of the foregoing reasons, the Court wil **DENY** Ali and Hasan's Motion for Change of Venue.

## I. Ali and Hasan's Motion in Limine to Preclude Any Use of Statements of Co-Defendants

Ali and Hasan next move the Court to preclude the Government from offering into evidence any extra-judicial statements by any co-defendants that directly or indirectly incriminate Ali or Hasan. They argue that the Supreme Court's decision in Bruton v. United States, 391 U.S. 123 (1968), shows such statements to be presumptively unreliable hearsay, and renders admission of such statements into evidence a direct violation of a defendant's rights under the Confrontation Clause of the Sixth Amendment. While the Government indicates in response its agreement with Ali and Hasan

about the core holding of <u>Bruton</u>, the Government nevertheless emphasizes that a statement of a co-conspirator is admissible in a joint trial notwithstanding <u>Bruton</u> if the statement (a) was made by a co-defendant who testifies at trial, (b) was made during the course, and in furtherance, of the conspiracy, (c) does not actually tend to incriminate the objecting defendant, and/or (d) is redacted to eliminate any reference to the objecting defendant.

In <u>Bruton</u>, the Supreme Court held that the Confrontation Clause of the Sixth Amendment is violated when a non-testifying co-defendant's confession naming the defendant as a participant in the crime is admitted at trial, even if the jury is instructed to consider the confession only against the confessing co-defendant. <u>Bruton</u>, 391 U.S. at 135-36 (1968). As noted above, however, subsequent case law has articulated several exceptions to this rule.

First, <u>Bruton</u> applies only to confessions by <u>non-testifying</u> co-defendants. To the extent that the co-defendant who made the extra-judicial statement takes the witness stand, there can be no violation of the defendant's Confrontation Clause rights, because he can cross-examine the co-defendant regarding the alleged confession. <u>See</u> <u>Joyner v. United States</u>, 547 F.2d 1199, 1202 n.5 (4th Cir. 1977) ("Of course, when [the co-defendant] subsequently took the stand, the Bruton objection was no longer seasonable.").

Second, statements excluded under the <u>Bruton</u> rule are distinct from statements made by non-testifying co-conspirators in

furtherance of the conspiracy, which are admissible against all conspirators under Rule 801(d)(2)(E) of the Federal Rules of Evidence. See, e.g., United States v. Shores, 33 F.3d 438, 442-44 (4th Cir. 1994) (concluding that the "admission of the challenged statements did not violate [the defendant's] Confrontation Clause rights, because those statements were admissible against him under the co-conspirator exception to the hearsay rule"). Accordingly, if one of the co-defendants made a statement during the course, and in furtherance, of the alleged conspiracy, Bruton would be inapplicable, and the statement would be admissible against Ali, Hasan, and the other Defendants. See United States v. Brooks, 957 F.2d 1138, 1146 & n.8 (4th Cir. 1992). Of course, it seems to the Court unlikely that any statements in furtherance of the conspiracy will be offered in this case, because all of the statements obtained by the Government from the Defendants occurred after the conspiracy ended. Should the Government seek to offer any such statement, of course, it would first have to proffer the statement to the Court for a determination regarding its admissibility under Rule 801.

Third, there is no Sixth Amendment violation under Bruton unless the extra-judicial statement offered is "facially incriminating," as opposed to a statement that only becomes incriminating when linked to other evidence. Richardson v. Marsh, 481 U.S. 200, 208-09 (1987); accord United States v. Lighty, 616 F.3d 321, 376 (4th Cir. 2010) (citing United States v. Campbell,

935 F.2d 39, 43 (4th Cir. 1991)); United States v. Najjar, 300 F.3d 466, 475 (4th Cir. 2002); United States v. Locklear, 24 F.3d 641, 646 (4th Cir. 1994).

Fourth, if a non-testifying co-defendant's extra-judicial statement can be "redacted to eliminate any reference to the defendant, or if 'the defendant's name can be replaced by a symbol or neutral pronoun,' such statement is admissible" notwithstanding Bruton. Lighty, 616 F.3d at 376 (quoting United States v. Vogt, 910 F.2d 1184, 1191 (4th Cir. 1990)) (internal citation omitted); United States v. Akinkoye, 185 F.3d 192, 198 (4th Cir. 1999) (quoting Gray v. Maryland, 523 U.S. 185, 196 (1998)). Naturally, a redaction that clearly identifies a defendant, albeit not by name, still violates the Sixth Amendment and cannot be cured by a jury instruction. Gray, 523 U.S. at 195-96. "[S]tatements that incriminate by inference or only when linked with later evidence" are differentiated from "those that obviously refer to a particular person or involve inferences a jury could make without additional evidence." Lighty, 616 F.3d at 376-77 (citing Gray, 523 U.S. at 196). Only statements of the latter variety create a constitutional violation. Lighty, 616 F.3d at 377. Furthermore, "[i]f a proffered statement of one non-testifying co-defendant becomes incriminating against another by virtue of an inference from other evidence at trial, the Confrontation Clause may not be offended if those statements are redacted and a proper limiting jury instruction is given." Id. at 376.

The Government has provided the Court with an example of how it proposes to comply with Bruton. According to Special Agent Knox's report, on April 4, 2010, Hasan made the following statement:

HASSAN stated that approximately eight days prior to the attack on USS NICHOLAS he and nine other men departed Somalia in three vessels with the intentions of pirating a merchant vessel and obtaining money as ransom. HASSAN stated he was told he would receive thirty thousand USD for a successful mission. HASSAN stated that immediately prior to the attack on USS NICHOLAS, the three vessels were tied together and all the men were on the largest of the three vessels. When they saw the light from what they thought was a merchant vessel, all but two men jumped into smaller vessels in order to overtake the merchant vessel. HASSAN stated he was in the vessel with "Gubal" and "Abdi." HASSAN admitted that his job on the vessel was piloting and using the Rocket Propelled Grenade (RPG) if needed. HASSAN stated when they neared the large vessel, "Gubal" and "Abdi" fired shots from rifles they had. HASSAN stated the large vessel then began shooting at his vessel and he sped away as quickly as possible. HASSAN admitted to throwing the weapons (two rifles and one RPG) overboard after the attack. Further, HASSAN stated they also got rid of a ladder they had which would have been used for boarding a merchant vessel.

Docket No. 150 at 4.

As the Government admits, the fifth and seventh sentences of the paragraph clearly implicate the Bruton rule. However, the Government suggests that it can simply redact the names "Gubal" and "Abdi." Specifically, the Government suggests that the fifth sentence can be replaced with: "HASSAN stated he was in the vessel with two other persons," and the seventh sentence similarly can be replaced with: "HASSAN stated when they neared the large vessel, the two other persons fired shots from rifles they had."

In reply, Ali and Hasan argue that such alterations are inappropriate and insufficient to protect their Sixth Amendment rights. There is some merit to Ali and Hasan's arguments in this regard. Altering a statement in order to protect a co-defendant's Sixth Amendment rights is permissible so long as it is not clear from the revised statement that a change has been made. See Lighty, 616 F.3d at 377 (finding that redaction was permitted, in part, because "it would have been unclear to the jury that the statements had been altered at all"). However, as noted above, even redacted statements can potentially create a constitutional violation incurable by a jury instruction if the statements nevertheless "obviously identify the defendant, even without naming him." Id. at 377-78. Ali and Hasan argue that they would be readily identifiable from the statement provided above, even with the Government's proposed redactions, because the Government will likely argue in its opening statement that Ali, Hasan, and Dire attacked the USS Nicholas, and were subsequently captured, together in a single assault boat.

The Fourth Circuit's recent decision in Lighty is instructive on this issue. Lighty involved a kidnapping and murder conspiracy allegedly perpetrated by three individuals, Lighty, Flood, and Wilson. Wilson's case was severed and tried separately "[b]ecause Wilson made statements implicating Lighty and Flood." Id. at 336. In that case, the Fourth Circuit affirmed a district court's decision to permit the Government to redact a witness's testimony

at Lighty's trial about what Lighty had told the witness about the alleged kidnapping and murder. Specifically, the district court permitted the Government to replace the phrase "Flood, Wilson, and Mathis" with the phrase "three other people" in describing who accompanied Lighty to the scene of the kidnapping, in order to protect Flood's Confrontation Clause rights. Id. at 376. In finding that redaction acceptable, the Fourth Circuit noted that redactions that merely insert the word "deleted" or leave a blank space, using the example provided in Gray, 523 U.S. at 196, raise constitutional concerns. Id. at 377. However, the Fourth Circuit proceeded to explain that it has "continued to allow general references to 'another person' or 'another individual' in such statements, because '[t]he Supreme Court has strongly implied that such statements do not offend the Sixth Amendment.'" Id. (quoting Akinkoye, 185 F.3d at 198); see also Gray, 523 U.S. at 196 (suggesting that "Question: Who was in the group that beat [the victim]? Answer: Me and a few other guys." would have been an acceptable redaction).

Although it appears that the Government's proposed redactions in this case would likely be acceptable under the foregoing case law, especially given their similarity to the redactions affirmed by the Fourth Circuit in Lighty, the Court believes there to be an alternative manner of redaction in this case that would better balance the competing interests of the parties in this case and be even less likely to run afoul of Bruton and its progeny. These

98

interests, as well as the complexity of this case and the magnitude of duplicative work that a mistrial or retrial due to potential <u>Bruton</u> violations would necessitate, counsel adopting these alternative redactions. Thus, instead of the phrase "two other persons" proposed by the Government, the phrase should simply be "other persons." Thus, the fifth sentence would read: "HASSAN stated he was in the vessel with other persons." The seventh sentence would read: "HASSAN stated when they neared the large vessel, the other persons fired shots from rifles they had." Redacting Special Agent Knox's report of Hasan's statement in this manner is permissible under <u>Bruton</u> and its progeny because the redactions do not specifically identify Ali, and also because the jury would be unable to tell that any alterations to the report, or to Hasan's statement, had been made.

Accordingly, for the foregoing reasons, the Court will **DENY** Ali and Hasan's motion <u>in limine</u> to preclude any use of statements of co-defendants. However, the Court will **ORDER** the Government to redact Special Agent Knox's report as detailed above for any use at trial.

### J. Ali's Motion to Dismiss All Counts of the Superseding Indictment for Destruction and/or Spoliation of Evidence

Defendant Ali seeks dismissal of the Superseding Indictment on the grounds that the Government destroyed evidence, namely the assault boat from which Defendants allegedly fired upon the USS Nicholas. The Government responds by arguing that the crew of the

USS Nicholas did not act in bad faith by sinking the assault boat, that the assault boat possessed no exculpatory evidence, and, in any event, the assault boat was fully documented by photographs and video footage taken by the crew prior to its sinking.

The Due Process Clause of the Fourteenth Amendment "require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense." California v. Trombetta, 467 U.S. 479, 485 (1984). To effectuate this constitutional guarantee, the Supreme Court has required the Government to "deliver[] exculpatory evidence into the hands of the accused." Id. Accordingly, "[a] defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to the guilt of the defendant or relevant to the punishment to be imposed. Id. (citing Brady, 373 U.S. at 87).

> Whatever duty the Constitution imposes . . . to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

Trombetta, 467 U.S. at 488-89. In addition, dismissal as a result of destruction of evidence is only appropriate where authorities have made such evidence unavailable as a result of bad faith. See id. at 488 (noting that authorities did not destroy evidence "in a calculated effort to circumvent the disclosure requirements established by Brady v. Maryland and its progeny"); Arizona v.

Youngblood, 488 U.S. 51, 56 (1988) (quoting Trombetta, 467 U.S. at 488) (noting that the Court's decision in Trombetta to deny the defendant's destruction of evidence claim was premised in part on the fact that the authorities had acted in "'good faith and in accord with their normal practice'").

Ali argues that the crew of the USS Nicholas acted in bad faith in destroying the assault boat from which the Defendants had allegedly attacked the USS Nicholas. Ali claims that the USS Nicholas had no good reason to destroy the vessel, and that the USS Nicholas should have been prepared either to lift the vessel onto its deck or to tow it to port. Ali further argues that the assault boat possessed exculpatory value, in that the assault boat's small size would be evidence that the Defendants would not have intended to attack a vessel the size of the USS Nicholas. Ali further claims that the assault boat contained other exculpatory evidence. Ali also argues that the photographs and videotapes of the assault boat taken by the crew of the USS Nicholas are woefully inadequate, particularly due to poor lighting, to serve as substitutes for the assault boat itself as a piece of evidence.

Ali's assertions are without merit. As an initial matter, the spoliation doctrine presupposes that the Government had the ability to possess and control the assault boat at some time prior to its destruction. See, e.g., United States v. Hughes, 211 F.3d 676, 688 (1st Cir. 2000) (affirming a district court's ruling that the Government was under no obligation to produce crime scene

photographs that had been taken and retained by Mexican law enforcement, because the photographs were never under the Government's control). Because the USS Nicholas was unable to lift the assault boat onto its deck or to tow the assault boat without seriously limiting its capability of completing its military mission, the Government had no duty to preserve the evidence for the Defendants. Id. ("[T]he government has no duty to produce evidence outside of its control, and it is not responsible for the preservation of evidence that was never in its control in the first place."). Testimony at the evidentiary hearing confirmed that the crew of the USS Nicholas was logistically unable to lift the assault boat on board the USS Nicholas, and that towing the assault boat would also have hampered the USS Nicholas's pursuit of the mother ship and consequent ability to protect itself. See Hr'g Tr. at 34:5-13 (Hutchins Test.), 69:21-71:6, 76:24-77:7, 153:22-154:14.

Even assuming that the assault boat was in the possession of the crew of the USS Nicholas, the Government only violates a defendant's constitutional rights, as discussed above, when the Government destroys exculpatory evidence in bad faith. Trombetta, 467 U.S. at 488-89; Youngblood, 488 U.S. at 56. Despite Ali's arguments about bad faith, Ali has presented no evidence that the crew of the USS Nicholas was aware of any exculpatory evidence on the assault boat, let alone destroyed it in bad faith. Lt. Hutchins acknowledged at the evidentiary hearing that certain contents of the assault boat that the boarding party considered

immaterial were left on it. Hr'g Tr. at 154:15-155:5. However, the Government listed in its response brief the contents observed by the boarding party: bullets, fresh water, 21 5-gallon fuel drums, food, and cigarettes. See Docket No. 109 at 2. Although Ali reiterates the claimed evidentiary value of the assault boat and its contents in reply, Ali notably does not claim that any of the items listed by the Government would have been exculpatory. See Docket No. 128 at 5-7. In fact, if anything, such evidence might be inculpatory of the offense of piracy, since excess fuel and bullets are arguably tools used in piratical cruises. Moreover, the crew of the USS Nicholas documented the assault boat through photographs and video footage. See United States v. Revolorio-Ramo, 468 F.3d 771, 773-75 (11th Cir. 2006) (rejecting the defendant's argument that the Government had destroyed the defendant's boat and its contents in bad faith, in part, because before Coast Guard destroyed the boat due to the navigational hazard it presented, they attempted to preserve evidence by taking photographs and video footage). Furthermore, to the extent that the small size of the assault boat might, in fact, be exculpatory evidence, the photographs and video footage serve as substitutes for such evidence.

For the foregoing reasons, the Court will **DENY** Ali's motion to dismiss all counts of the Superseding Indictment due to the destruction and/or spoliation of evidence.

## K. Ali's Motion for Additional Peremptory Challenges

Ali moves the Court for additional peremptory challenges for each Defendant pursuant to Rule 24(b) of the Federal Rules of Criminal Procedure. Rule 24(b) provides that "[t]he court may allow additional peremptory challenges to multiple defendants, and may allow the defendants to exercise those challenges separately or jointly." Fed. R. Crim. P. 24(b).

Normally, in a non-capital felony case involving multiple defendants, the Government receives six (6) peremptory challenges, and the defendants jointly receive ten (10) challenges. Fed. R. Crim. P. 24(b)(2). By his motion, Ali seeks both additional peremptory challenges, in whatever amount the Court deems appropriate, and permission to use his challenges separately from the other Defendants. Ali bases his motion on the possibility that the jury pool will contain a large percentage of persons who have served in, or are related to persons who have served in, the United States Navy, as well as in light of the heightened local media coverage of the Defendants' prosecution.

The Government opposes Ali's request, and argues that there is no particular or extraordinary need for extra peremptory challenges or the right to exercise those challenges separately by the Defendants. The Government argues that Ali's unsupported speculation as to the nature of the jury pool in the Norfolk Division of the Eastern District of Virginia is insufficient to warrant granting Defendant's motion. The Government further notes

that the United States Attorney's Office regularly prosecutes members of the United States Navy for marriage fraud and false claims in this Division without requesting additional peremptory challenges.

Whether to grant or deny a defendant's request for additional peremptory challenges beyond the ten (10) challenges provided by Rule 24(b)(2) is within the trial court's discretion. See United States v. Meredith, 824 F.2d 1418, 1423 (4th Cir. 1987) (affirming the district court's denial of a request for additional peremptory challenges in a seven-defendant case under an abuse of discretion standard). Although this Court, like the Government, is skeptical of Ali's assertions about the nature of the jury pool in this Division, the Court believes that the unique nature of this case justifies providing Defendants and the Government with additional peremptory challenges, to ensure an unbiased jury. While providing additional peremptory challenges may protract jury selection to some degree, it is unlikely to be unduly burdensome, especially in light of the novelty and complexity of this case. In any event, the Court finds it to be an appropriate safeguard to ensure that Defendants are afforded a fair trial.

On the other hand, Ali has failed to provide any valid ground for permitting Defendants to use their peremptory challenges separately in this case, and the Court does not believe there to be any such need. At this point, Defendants appear to share the same interest in obtaining an unbiased jury.

For the foregoing reasons, the Court will **GRANT** Ali's motion. The Court will provide the Government with nine (9) peremptory challenges and Defendants with eighteen (18) peremptory challenges, to be exercised jointly.

### L. Ali's Motion to Dismiss or Consolidate Counts in the Superseding Indictment as Multiplicitous in Violation of the Double Jeopardy Clause of the Fifth Amendment

Ali lastly moves to dismiss or consolidate several counts in the Superseding Indictment on the grounds that they are unfairly multiplicitous in violation of the Double Jeopardy Clause. In response, the Government argues that Ali has waived his objection in this regard because it was filed after the court-imposed deadline for filing all motions. With regard to the substance of Ali's motion, the Government contends that the offenses alleged each either expressly provide for multiple punishments or do not overlap such that they violate the Double Jeopardy Clause.

#### 1. The Timeliness of Ali's Motion and Waiver

Before addressing Ali's substantive argument, the Government argues that the Court should deny Ali's motion on procedural grounds, because it was submitted nearly two weeks after the Court's July 30, 2010 deadline for filing motions without leave of the Court. The Government argues that this constitutes waiver of Ali's multiplicity objection.

The Federal Rules of Criminal Procedure provide that "[a] party waives any Rule 12(b)(3) . . . objection . . . not raised by

the deadline the court sets under Rule 12(c) or by any extension
the court provides." Fed. R. Crim. P. 12(e). However, "[f]or good
cause, the court may grant relief from the waiver." Id.; see also
E.D. Va. Local Crim. R. 47(H) & (I) (requiring timely filing of
motions, and providing that "[a]ny requests for an extension of
time relating to motions must be in writing and, in general, will
be looked upon with disfavor.").

Ali did not file an independent written request (i.e., a
motion) for an extension of time in connection with the instant
motion as required by the Local Rules of this District. However,
in a written reply to the Government's response, Ali argues that an
extension is warranted for two reasons:

> (1) Counsel have been diligently working on researching,
> drafting and submitting all of the other motions which
> were filed by [the] deadline and simply could not
> complete work on this motion by that time, and (2) much
> of the basis for this Motion was raised and enhanced by
> the responses which were filed by the government in their
> responses to various other motions.

Docket No. 145 at 1.

This Court naturally takes a dim view of any violation of the
Federal Rules of Criminal Procedure or the Local Rules of this
District. However, in light of the reasons articulated by Ali's
counsel, the novelty and complexity of this case, the Government's
filing of a Superseding Indictment in the midst of motion practice,
the sheer number of motions filed, and the relatively insignificant
time of the delay in filing the instant motion, the Court, in its

107

discretion, is inclined to, and will, consider the substance of Ali's motion notwithstanding its untimeliness.

## 2. The Substance of Ali's Motion

Turning to the substance of the motion, Ali argues that the fourteen counts of the Superseding Indictment are all based on the same underlying act, to wit, the firing on the USS Nicholas, and thus present allegations that are indistinguishable in law or fact. Ali further argues that not only does the Government unfairly charge a single act in multiple counts, but it also attempts to use the single act as a predicate offense for several other offenses providing for additional and consecutive punishment. Therefore, Ali contends, the Double Jeopardy Clause would be violated if the Government were permitted to prosecute all of the charges alleged in the Superseding Indictment and Ali were to be convicted of, and punished for, multiple offenses.

The Double Jeopardy Clause of the Fifth Amendment provides "[no person shall] be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. There are two distinct components to the constitutional guarantee against double jeopardy: (1) "'protections against the imposition of cumulative punishments for the same offense in a single criminal trial'" and (2) protections "'against being subjected to successive prosecutions for the same offense, without regard to the actual imposition of punishment.'" United States v. Goodine, 400 F.3d 202, 206 (4th Cir. 2005) (quoting United States v. Ragins, 840 F.2d

1184, 1187 (4th Cir. 1988)). Ali's motion invokes the former protections, i.e., the protection against cumulative punishments for the same offense in a single trial. "[I]n the multiple punishments context, that interest is 'limited to ensuring that the total punishment did not exceed that authorized by the legislature.'" Jones v. Thomas, 491 U.S. 376, 381 (1989) (quoting United States v. Halper, 490 U.S. 435, 450 (1989)). "'The legislature remains free under the Double Jeopardy Clause to define crimes and fix punishments; but once the legislature has acted courts may not impose more than one punishment for the same offense . . . .'" United States v. Martin, 523 F.3d 281, 290 (4th Cir. 2008) (quoting Brown v. Ohio, 432 U.S. 161, 165 (1977)). "In the end," a court faced with a cumulative punishments challenge under the Double Jeopardy Clause is required only "'to determine whether Congress intended to impose multiple punishments.'" Martin, 523 F.3d at 290 (quoting United States v. Chandia, 514 F.3d 365, 372 (4th Cir. 2008)).

In making this determination, courts first look to the text of the criminal statutes at issue. Martin, 523 F.3d at 290.

> "Congress ordinarily does not intend to punish the same offense under two different statutes. Accordingly, where two statutory provisions proscribe the 'same offense,' they are construed not to authorize cumulative punishments in the absence of a clear indication of contrary legislative intent." Of course, if the statutory language allows multiple punishments, then there is no double jeopardy problem and we need not go any further.

Id. at 290-91 (quoting Whalen v. United States, 445 U.S. 684, 692 (1980)).

> If, however, the statute provides no definitive indication of congressional intent, we apply the rule of statutory construction prescribed by the Supreme Court in Blockburger v. United States. Under Blockburger, "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not." If the elements of each criminal statute "do not overlap, then multiple punishments are presumed to be authorized."

Martin, 523 F.3d at 291 (quoting Blockburger v. United States, 284 U.S. 299, 304 (1932) & United States v. Terry, 86 F.3d 353, 356 (4th Cir. 1996)) (internal citations omitted). To the extent that a defendant is charged with greater and lesser included offenses, the Double Jeopardy Clause does not prohibit simultaneous prosecution. See Jeffers v. United States, 432 U.S. 137, 152 (1977) ("a defendant is normally entitled to have charges on a greater and lesser offense resolved in one proceeding"); United States v. Luskin, 926 F.2d 372, 378 (4th Cir. 1991) ("Under our judicial system, prosecutors are permitted to carve up criminal conduct into multiple counts, even if some of the counts are lesser included offenses or constitutionally identical offenses.").

Ali's double jeopardy argument fails. With respect to each of the statutes challenged by Ali's motion, either the text of the statute itself or the Blockburger test demonstrates that Congress intended to allow for the imposition of multiple punishments.

110

### a. Counts One Through Nine and Fourteen

As noted above, Count One charges Defendants with piracy, in violation of 18 U.S.C. § 1651, which includes the element of "piracy as defined by the law of nations." 18 U.S.C. § 1651. Count Two charges Defendants with attack to plunder a vessel, in violation of 18 U.S.C. § 1659, which includes the element "with the intent to unlawfully plunder." 18 U.S.C. § 1659. Thus, on their faces, Counts One and Two each contain unique elements, and therefore pass the Blockburger test. However, while the Government concedes that this Court's decision on Defendants' separately filed motions to dismiss Count One may render Counts One and Two multiplicitous, that is not necessarily the case, since 18 U.S.C. § 1659 requires a nexus to the United States, while 18 U.S.C. § 1651 requires no such nexus in the general piracy context.

Count Three charges Defendants with an act of violence against persons on a vessel, in violation of 18 U.S.C. § 2291(a)(6). Unlike the statute underlying Count Two, 18 U.S.C. § 2291(a)(6) does not include an "intent" element, and requires only that the act "is likely to endanger the safety of the vessel or those on board." 18 U.S.C. § 2291(a)(6). Accordingly, Count Three satisfies the Blockburger test vis-a-vis Counts One and Two, and is therefore not multiplicitous.

Counts Four, Nine, and Fourteen each allege a conspiracy offense arising out of the same course of conduct charged in other Counts. Nevertheless, it is a "settled principle" that "'the

commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses.'" <u>Callanan v. United States</u>, 364 U.S. 587, 593 (1961) (quoting <u>Pinkerton v. United States</u>, 328 U.S. 640, 643 (1946)); <u>see also</u> <u>United States v. Love</u>, 767 F.2d 1052, 1062 (4th Cir. 1985) ("The Supreme Court has determined that conspiracies and the substantive offenses committed in the course of those conspiracies are separate offenses and may be charged separately."). Accordingly, Counts Four, Nine, and Fourteen charge separate and distinct crimes that do not violate the Double Jeopardy Clause.

Counts Five through Eight can also properly result in multiple punishments, because each Count easily passes the <u>Blockburger</u> test. Counts Five and Six charge Defendants with assault with a dangerous weapon on the crew of the USS Nicholas in violation of 18 U.S.C. § 113(a)(3). Count Five relates to Ali allegedly shooting a firearm, and Count Six relates to Dire allegedly shooting a firearm. Counts Five and Six also require proof of the unique element that the Defendants acted "with intent to do bodily harm." 18 U.S.C. § 113(a)(3). Counts Seven and Eight, on the other hand, charge Defendants with assault with a dangerous weapon on a federal officer or employee, in violation of 18 U.S.C. § 111 subsections (a)(1) and (b). Unlike Counts Five and Six, Counts Seven and Eight do not require proof that Defendants acted "with intent to do bodily harm." 18 U.S.C. § 113(a)(3). Instead, Counts Seven and Eight require proof of the unique element that the assaults were on

federal officers or employees while the victims "were engaged in the performance of official duties." 18 U.S.C. § 111(a). Accordingly, Counts Five through Eight satisfy the <u>Blockburger</u> test, because each statute contains at least one unique element.

### b. Counts Ten Through Twelve

Ali also challenges Counts Ten through Twelve, each of which charges a substantive offense in violation of 18 U.S.C. § 924(c). The statutory text of 18 U.S.C. § 924(c), however, expressly contemplates multiple punishments by sentencing those who violate it to various terms of imprisonment "in addition to the punishment provided for [the underlying] crime of violence or drug trafficking crime." 18 U.S.C. § 924(c)(1)(A). This explicit language shows that "Congress's intent was to add five additional years of mandatory, consecutive imprisonment without parole to any crime of violence in which a firearm was used or carried." <u>United States v. Johnson</u>, 32 F.3d 82, 85 (4th Cir. 1993).

Defendant separately claims that Counts Ten through Twelve are multiplicitous because they divide a single crime into three separate offenses. However, "'[i]t is now firmly established that the imposition of separate consecutive sentences for multiple § 924(c) violations occurring during the same criminal episode are lawful.'" <u>United States v. Higgs</u>, 353 F.3d 281, 333 (4th Cir. 2003) (quoting <u>United States v. Burnette</u>, 170 F.3d 567, 572 (6th Cir. 1999)); <u>accord</u> <u>United States v. Camps</u>, 32 F.3d 102, 106 (4th

Cir. 1994).[17]   As with Counts Five and Six, Counts Ten through Twelve are each based on a separate firearm offense:   Count Ten on Ali's alleged use of an AK-47 to fire upon the USS Nicholas, Count Eleven on Dire's use of another AK-47 to fire upon the USS Nicholas, and Count Twelve on Defendants' possession of an RPG during the attack on the USS Nicholas.   See also Lighty, 616 F.3d at 370-71 (affirming the imposition of multiple consecutive sentences under 18 U.S.C. § 924(c)(1) as "appropriate whenever there have been multiple, separate acts of firearm use or carriage, even when all of those acts relate to a single predicate offense").   Accordingly, Counts Ten through Twelve do not violate the Double Jeopardy Clause.

### c.   Count Thirteen

Count Thirteen charges Defendants with carrying an explosive during the commission of a felony, in violation of 18 U.S.C. § 844(h).   The Government concedes that whether Counts Twelve and Thirteen charge the same offense is a close question.   Although Count Twelve requires proof of a "firearm," and Count Thirteen requires proof of the apparently distinct element of an "explosive," such elements might not, upon closer examination, actually be distinct.

---

[17] Ali's reliance on United States v. Casey, 776 F. Supp. 272 (E.D. Va. 1991) in connection with this motion is unavailing.   The Fourth Circuit expressly rejected the Casey court's interpretation of 18 U.S.C. § 924(c) in Camps.   See 32 F.3d at 109 n.8.

A firearm for purposes of 18 U.S.C. § 924(c) includes a "destructive device"—18 U.S.C. § 921(a)(3)(D)—and a "destructive device," in turn, includes any "explosive" or "incendiary . . . grenade." 18 U.S.C. § 921(a)(4)(A)(ii). By the same token, an "explosive" as used in § 844(h)(2) includes, inter alia, "other explosive or incendiary devices within the meaning of" 18 U.S.C. § 232(5). 18 U.S.C. § 844(j). Section 232(5) further defines "explosive or incendiary device" to include any explosive or incendiary grenade.

In light of the foregoing statutory definitions, it appears that the statutes underlying Counts Twelve and Thirteen impermissibly overlap for purposes of the Blockburger test. However, they need not be dismissed as multiplicitous at this time, because they would, notwithstanding their overlapping elements, still constitute greater and lesser included offenses. Count Twelve prescribes a mandatory consecutive sentence of "not less than 30 years." 18 U.S.C. § 924(c)(1)(B)(ii). By contrast, Count Thirteen prescribes a mandatory consecutive sentence of only ten (10) years. 18 U.S.C. § 844(h). Should Ali be convicted on both Counts, he may move at that time to have the lesser count dismissed.

For the foregoing reasons, the Court **GRANTS** Ali leave to file the instant motion out of time, but **DENIES** the instant motion on the merits.

115

## IV. CONCLUSION

On the basis of the foregoing analysis, Defendants' motions (Docket Nos. 70, 72, 73, 77, 79, 81, 87, 93, 94, 96, 98, 104, 107, 111, 112, 113, 114, 115, 117, 119, 135, and 141) are **DENIED**, except as follows:

Gurewardher's motion to suppress (Docket No. 85) is **GRANTED IN PART** (with respect to his April 2, 2010 statements) and otherwise **DENIED**.

Defendants' joint motion to compel discovery (Docket No. 127) is **GRANTED IN PART** (with respect to the written qualifications of interpreter Aziz Ismail, to the extent not already provided at the evidentiary hearing) and otherwise **DENIED.**

The Government is **ORDERED** to redact the statement of Hasan within Special Agent Knox's report as detailed herein for any use at trial.

Ali's motion for additional peremptory challenges (Docket No. 74) is **GRANTED.**

The Clerk is **DIRECTED** to send a copy of this Opinion and Order to the United States Attorney's Office in Norfolk, Virginia, and to counsel for each of the Defendants.

**IT IS SO ORDERED.**

/s/ Mark S. Davis
Mark S. Davis
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
October 29, 2010